OVERTON, J.
The purpose of this suit is to recover of defendant $11,000, on three policies issued by it, in February and June, 1920, on the life of Ulrick C. Eckendorff. Mrs. Mary L. Eckendorff, the plaintiff herein, is named as. the beneficiary in each policy. Eckendorff died on June 28, 1920. Plaintiff made proof of her husband’s death, and delivered the proof to defendant, but the latter refused to pay the policies. Each policy contains a provision to the effect that the company shall not be liable in the event the insured, whether sane or insane, meets death by his own hand or act, within one year after the issuance of the policy, and the defense is that Eckendorff committed suicide.
The determination of the case, as presented, involves an inquiry as to whether there was a motive for the suicide alleged, and this involves an inquiry into Eckendorff’s business affairs, as it is Contended by defendant that Eckendorff was moved to take his own life, because of acts committed by him in the .business with which he was connected.
Eckendorff was a member of the firm of Bertaud & Co. He was placed in charge of the firm’s office and books. He kept the books himself from the time of the organization of the company, in September, 1919, until February 23, 1920, when Edgar -Bouney was employed to keep them under the general directions of Eckendorff. When Bouney assumed the discharge of his duties, the books had been posted only to January 1, 1920. Bouney, acting under the directions of Eckendorff, posted them from that date up to the time he began work, and during Eckendorff’s lifetime continued to discharge his duties as bookkeeper under Eekendorff’s supervision. At the time the partnership of Bertaud & Co. was organized, it was agreed that Eckendorff should be allowed a salary of $3,600 a year, payable monthly, in installments of $300 a month. It was also agreed that the members of the firm should not withdraw money from it, except the salary allowed, unless authorized so to do. Both Bertaud and Eckendorff possessed authority to draw checks in the name of the firm. Eckendorff drew his salary each month and, in January, 1920, drew, under authority granted him, $1,000, in addition to his salary. He drew the same amount, each *185 month, in addition to salary, in February, March, and April of the same year, and $500 in the month of May. The amounts, not including salary, withdrawn from the firm, during the last four months mentioned, aggregating $3,500, were withdrawn without authority, although, had permission ,been requested for their withdrawal, it likely would have been granted. Permission was not asked. The bookkeeper, of course, knew of the withdrawals, though not of the lack of authority. Bertaud never examined the hooks, and knew nothing of the unauthorized withdrawals. He had implicit confidence in Eckendorff, and to obtain knowledge of the condition of the business, as shown by the books, relied on monthly statements made by Eckendorff. On June 14, 1920, Eckendorff instructed the bookkeeper to draw a check for $4,238.83, to be used in purchasing exchange to pay the Stuttgart Rice Mill, and to charge that amount to the account of the mill. The bookkeeper did so, and Eckendorff signed the check for Bertaud & Oo. He then procured, at the main office of the Canal-Commercial Trust & Savings Bank, a cashier’s check for the above sum, but,- instead of having the check made payable to the order of the Stuttgart Rice Mill, Eckendorff had it made payable to his own order, and then deposited the cheek to his personal credit in a branch of the Canal-Commercial Trust & Savings Bank. At the time that Eckendorff gave instructions to the bookkeeper to draw the above check for $4,238.-83, and to charge the amount to the account of the Stuttgart Rice Mill, there appeared on the books of Bertaud & Co. a credit in favor of the mill in that sum, when as a matter of fact Bertaud & Co. was not then indebted to that concern. Eckendorff had so manipulated the entry on the books as to make it appear that the Stuttgart Rice Mill was entitled to the above sum. This, he accomplished by not entering, or not causing to be entered on the books, credits, in favor of his firm, against this indebtedness, consisting of discounts to which his firm was entitled, to freight paid, and other credits. On June 26, 1920, shortly after Eckendorff had deposited the above amount to his individual credit, he drew his personal check, in favor of Bertaud & Co., ■ on the Canal-Commercial Trust- & Savings Bank, for $3,500, and instructed the bookkeeper of Bertaud & Co. to place it to his individual account. Therefore Eckendorff had made it appear on the books of the firm that the apparent credit in favor of the Stuttgart Rice Mill had been paid, and, with a part of the money derived from the manipulation of that account, balanced his individual account with his firm, to the extent to which that account was unauthorized.
In the early morning of June 28, 1920, screams were heard from the Eckendorff residence, and a member of the fire department across the street, and some of the neighbors, went hurriedly to the residence. Some of them went upstairs, and into the room, in which Eckendorff was, and found him lying in the center of the bed, his head on a pillow at the foot of the bed, and his feet at its head. A wound was observed in his right temple through which the blood was oozing. Eckendorff was gasping for breath.
In a short while an ambulance from one of the hospitals reached the Eckendorff residence. One of the students from the hospital, in making an examination of Eckendorff, turned him over, and a 38-caliber revolver, belonging to Eckendorff, was found under his shoulder. An examination of the pistol disclosed that one of the cartridges in the cylinder had been exploded, and that the hammer of the pistol was against the exploded cartridge.
Eckendorff died a few minutes after he was taken to the hospital. The assistant coroner made an examination of the body, and testified that Eckendorff’s face was *188 slightly powder marked. Those who visited the residence do not seem to have observed the powder marks, though this is not strange since Eckendorff’s face was then bloody, and apparently no examination was made to ascertain whether there were powder marks, ^except the one made later by the assistant coroner.
Mrs. Eckendorff, the plaintiff herein, although in her home, at the time of the unfortunate occurrence, did not see proper to take the witness stand. She was examined, however, by a police officer soon after the tragedy. In the course of that examination, which was not an extended one, doubtless due to her hysterical state, Mrs. Eckendorff said, in response to a question asked, that her husband’s financial affairs were not in good condition. Later she told Bertaud that her husband had “forged a check on the Stuttgart Rice Mill.” It was not until soon after this that Bertaud discovered Eckendorffis unauthorized withdrawals and his manipulations of the Stuttgart Rice Mill account.
Opinion.
 When, in order to avoid liability on a policy issued by it, an insurance company relies on the defense that the insured committed suicide, the burden rests on the company to establish that the insured did commit suicide to the exclusion of every other reasonable hypothesis. Kohlman v. New York Life Ins. Co., 151 La. 607, 92 South. 132; Valesi v. Mutual Life Ins. Co., 151 La. 405, 91 South. 818. In weighing the evidence due consideration should be given to the strong presumption that exists against self-destruction. If, however, after giving due weight to that presumption, and after considering the evidence, it should be found that no other reasonable conclusion can be reached except that the insured took his own life, then there remains nothing jfor the courts to do, but to hold that the insured did so, and, to sustain the defense of suicide, when suicide may be urged as a defense under the provisions of the policy.
In the case at bar, we find a motive for the unfortunate act clearly established. Eckendorff had withdrawn funds from the firm, without authority, monthly, for several months. He had manipulated the Stuttgart Rice Mill account so as to make it appear that the mill was entitled to a credit, when in fact, it was not, and had availed himself of that act in order to obtain funds with which to balance his unauthorized withdrawals, and in order to provide money for other purposes, not disclosed. He unquestionably realized the wrong he had done, and necessarily must have felt that he had flagrantly violated the confidence of the firm of which he was a member. He evidently worried greatly over the matter, and it is reasonable to infer that he spoke to his wife about it, for she knew that he had committed some wrong in reference to the Stuttgart Rice Mill. Our conclusion is that the matter prayed upon Eckendorff’s mind, and was the moving cause for the suicide.
That he took his own life intentionally, we think the evidence clearly establishes. He could have met death in but one of three ways — by being murdered, by accident, or by his own act. That he was not murdered, we think, is clear. The report of the pistol awakened Mrs. Eckendorff, if she were not already awake. Had he been murdered, it is highly probable she would have heard the murderer, when he was making his escape, and certainly would have taken the stand and testified to the fact. Moreover, the pistol with which Eckendorff was shot belonged to him, and, while the fact that he owned it by no means negatives the theory that he was murdered, still it has a direct tendency to do so.
While no one of the above facts, taken alone, is sufficient to exclude the hypothesis *189 of murder, yet when they are considered together, and in . connection with the testimony as a whole, they satisfy the mind that Eekendorffi was not murdered. It is true that, in drawing this conclusion, we must take into consideration the fact that Eckendorif was only slightly powder marked, but that circumstance we do not think sufficient, in view of the remaining evidence in the ease, to justify us in rejecting the suicide theory. It is also true that the pistol was found under his shoulder, but this may be accounted for on the theory that there was likely some movement of the body, after the pistol dropped from his hand, following the shot, sufficient to cause it to slip down the pillow to the place where it was found.
In so far as respects the theoijy of death by accident, we think the evidence also excludes that hypothesis. Learned counsel for the plaintiff suggests that, as there were reports of burglaries in the neighborhood two or three days before, Eckendorff may have slept with his pistol, under his pillow, and may have heard a noise that he thought was caused by a burglar ; and, in an effort to protect his home, may have shot himself accidentally. However, we do not think so. The surrounding circumstances negative that theory. The bed showed no signs of having been used for sleeping purposes that night. The bed clothing was unrumpled. It is impossible to infer that he slept in that bed. The evidence negatives such a conclusion. Not having slept in it, it cannot be said that he was awakened in it by some noise, and accidentally shot himself in an effort to protect his home. If he slept at all that night, it was in some other bed, and it is hardly likely if he got out of bed to search for a burglar, that he would have lain down in another bed, in his search, especially in the position in which he lay, or that, at the conclusion of his search, he would have lain down in another bed at all. Moreover, had he heard such a noise, he certainly would have notified his wife, before making the search, and she would have been in position to have testified to the fact. Under the circumstances, we cannot reasonably escape the conclusion that Eckendorff, because of the motive assigned, lay down in bed and intentionally took his own life.
As Eckendorif killed himself intentionally,, his wife, the payee, cannot recover the insurance because of the suicide clause in the' policy. However, Mrs. Eckendorff is entitled to the premiums paid on the policies. These were tendered plaintiff by defendant, together with the interest and costs thereon to the date of tender, and amount to $288.75.
For the reasons assigned, it is ordered, adjudged, and decreed that the verdict of the jury, and the judgment of court, based thereon, be amended so as to reduce said verdict and judgment to $288.25, and, as thus amended, that said judgment be affirmed, plaintiff to pay the costs in both courts.
ST. PAUL, J., recused.