(107 So. 395)

No. 25429.

## FAULK v. MUTUAL LIFE INS. CO.

(Feb. 1, 1926.)

*(Syllabus by Editorial Staff.)*

1. **Insurance** ☞665(6)—Verdict of coroner's jury held entitled to no weight on question of suicide in action on policy.

A verdict of a coroner's jury is not competent to show whether insured committed suicide, but to show only fact of death, and, when received in evidence without restrictions, is entitled to no weight on question of suicide vel non.

2. **Insurance** ☞646(7)—Burden on insurer to prove that insured committed suicide.

In action on life policy, burden is on insurer to establish that insured committed suicide.

3. **Insurance** ☞659(2)—Evidence tending to negative theory of suicide by insured held properly admitted in rebuttal.

In action on life policy for death of insured, defense being suicide, it was competent for plaintiff, in rebuttal, to offer evidence showing that death was accidental, thus tending to negative theory of suicide.

4. **Coroners** ☞22—Member of coroner's jury held competent to testify to facts tending to negative theory of suicide by insured.

In action on life policy for death of insured, defense being suicide, member of coroner's jury which returned verdict of suicide was not incompetent to testify to facts tending to show that death was accidental.

5. **Evidence** ☞587.

All circumstances of a case should be considered together in determining whether insured committed suicide.

6. **Insurance** ☞646(7).

In action on life policy, there is a strong legal presumption against commission of suicide, and litigant alleging its commission must establish the fact.

7. **Insurance** ☞665(6).

In action on life policy, circumstantial evidence to establish suicide must exclude every other reasonable hypothesis.

8. **Insurance** ☞665(6)—Evidence held not to show suicide of insured, in view of absence of motive.

In action on life policy, defense being suicide by insured, evidence, especially lack of motive, *held* to fail to show, to exclusion of every other reasonable hypothesis, that insured committed suicide.

9. **Insurance** ☞646(8)—One seeking to recover double indemnity, payable when death caused by specified means, has burden of proving that death thus caused.

One seeking to recover double indemnity, under policy providing for payment thereof when death of insured caused by bodily injury, effected solely through external violent and ac-

cidental means, has burden of proving that death was thus caused to recover double indemnity.

**10. Insurance ⬤⇒646(7)—Beneficiary held entitled to double indemnity, where evidence left in doubt whether insured killed himself accidentally or intentionally.**

The evidence showing that insured killed himself, but leaving it doubtful whether he killed himself accidentally or intentionally, presumption is that he did so accidentally, entitling beneficiary to double indemnity, payable where death of insured is caused by bodily injury effected solely through external, violent, and accidental means.

Rogers, J., dissenting.

Appeal from Seventeenth Judicial District Court, Parish of Vermilion; W. W. Bailey, Judge.

Action by Rena Faulk against the Mutual Life Insurance Company. Judgment for plaintiff, and defendant appeals. Affirmed.

Weeks & Weeks, of New Iberia, and Denegre, Leovy & Chaffe, of New Orleans, for appellant.

John Nugier and Kitchell & Boudreaux, all of Abbeville, for appellee.

OVERTON, J. An agent of the Mutual Life Insurance Company of New York solicited Aliface Faulk to procure a policy on his life in the company represented by the agent. Faulk made application to the company for a policy, and the company issued him one, reading, in part, as follows:

"The Mutual Life Insurance Company of New York, in consideration of the annual premium of * * * promises to pay at the home office of the company in the city of New York, upon receipt at said home office of due proof of the death of Aliface Faulk, the insured, of the parish of Vermilion, state of Louisiana, $3,000 (the face amount of this policy), to his wife, Rena Faulk, in accordance with words of settlement indorsed on page 4 hereof, the beneficiary, or, if there further be received at said home office, due proof that such death resulted directly from bodily injury, received after the date of issue of this policy, independently and exclusively of all other causes, and that such bodily injury was effected solely through external, vio-

lent, and accidental means, and that such death occurred within 60 days after the date of such bodily injury, promises to pay to said beneficiary, instead of the face amount of this policy, $6,000 (double the face amount of this policy, herein called double indemnity), provided, however, that this double indemnity shall not be payable in the event of the insured's death as a result of * * * nor shall it be payable in the event of the insured's death at any time by his own act, whether sane or insane. * * * "

The foregoing clause, as to suicide, is an exception to the payment of double indemnity. The policy, however, contains another clause as to suicide, which affects the payment of the face amount of the contract. This clause reads as follows:

"The company shall not be liable hereunder (i. e., under the policy) in the event of the insured's death by his own act, whether sane or insane, during the period of one year after the date of issue of this policy."

Within one year after the date of the issuance of the policy, to wit, on August 19, 1920, between the hours of 6 and 7 in the morning, Faulk was found dead, with a gunshot wound in his breast, in a small pen in which he kept a jack, some 40 or 50 yards from his dwelling. Rena Faulk, the widow of the insured, and the beneficiary designated in the policy, claiming that her husband was killed as the result of the accidental discharge of a shotgun, filed proofs to that effect with the insurance company, and demanded the double indemnity provided for in the policy. The company, after making an investigation of the death of Faulk, concluded that he had committed suicide, and hence refused to pay the double indemnity, and, since Faulk, if the company was correct in this conclusion, had committed suicide within one year from the issuance of the policy, it refused to pay also the face amount of the policy.

Due to the foregoing refusal, the beneficiary instituted the present suit for the recovery of the double indemnity, alleging that her husband met his death instantly, or prac-

tically so, as the direct result of the accidental discharge of a shotgun. The defense is a denial that Faulk came to his death by accidental means, coupled with averments that, instead of thus coming to his death, he committed suicide, and did so within one year after the issuance of the policy.

The facts of the case are as follows: Faulk was a farmer. He owned no real property, but rented for the year 1920 a farm containing about 150 acres, located some four miles west of Abbeville, La. The farm leased by him was adapted to the planting of rice, and he planted it almost entirely to that cereal, planting also some corn and some potatoes. He was 31 years of age at the time of his death, was married, and was the father of 6 children, the oldest of whom was between 12 and 13 years of age. His wife expected to give birth to another child in the near future.

The night prior to his death, Faulk slept by the side of his wife, and she says that he slept well. He, his wife and children arose between 6 and 7 in the morning. Immediately after rising, Mrs. Faulk went to the kitchen to make the morning coffee, and her husband to the barn, which was located between 120 and 130 feet from his dwelling, for the purpose, apparently, of feeding his stock and chickens. Mrs. Faulk heard her husband call the chickens for the purpose of feeding them, and saw him take a jack, which he owned, to a well, located about 43 feet from the residence, for the purpose of watering the animal. A neighbor saw Faulk leading the jack, a few minutes later, towards a small pasture, in which he kept the animal during the day.

When Mrs. Faulk had made the coffee, she called to her husband to come, but received no answer. She went back to her work, and some two or three minutes later, heard the report of a shotgun, and went to the door, but saw nothing at that moment. A moment or two later she went to the well to get a bucket of water, and, while going there, saw smoke coming, as if from the side of the barn, and started to go there, but turned back, and then walked as far as the well, called her children, and went with them to the barn. She found her husband in a small pen, located on the side of the barn, lying dead. She sent one of her younger daughters to request Ophe Hebert, a neighbor, who resided about an acre and a half distant, to come at once. The child informed Ophe Hebert that her father was dead, and that her mother wished him to go over immediately. Hebert and his wife went to the Faulk home at once. Hebert saw Faulk lying in a pen, saw that he had received a gunshot wound and was dead. Hebert concluded that the coroner should be notified, and left immediately after viewing the body for the purpose of notifying that official.

On his way, Hebert met his brother Otis, only a short distance from the Faulk home, told him that Faulk was dead, and requested him to go to the home of the deceased. Otis Hebert complied with this request, and, when he reached the scene of the accident or suicide, saw and viewed the body of Faulk lying in the pen. Ophe Hebert went on his way to notify the coroner, and when he reached a telephone notified Dr. Edwards, the deputy coroner, that Faulk was found dead on his premises, and requested him to go there and hold an inquest.

Dr. Edwards complied immediately with the request and reached the home of the deceased at approximately 8 o'clock in the morning, or about an hour, or an hour and a half, after Faulk's death. He viewed the body, impaneled a jury of 5 men, who were then at the Faulk residence, and who had seen, or most of whom had seen, the body of the deceased lying in the pen. He swore Mrs. Faulk as a witness. She testified that her husband arose on the morning of his death, as usual; that he said he was going to the barn; that a little later she called him for coffee

and then heard the report of a gun; that when she reached the barn she found him dead and in the position in which he then was. The coroner's jury, after viewing the body and hearing the evidence of Mrs. Faulk, returned a verdict finding that Faulk came to his death about the hour of 6 a. m., on August 19, 1920, from the result of a gunshot wound inflicted by him with suicidal intent.

The place where the body of Faulk was found was a small lot, about 25x17 feet, lying immediately west of the barn, and so boarded in as to keep the greater part of the inside of it from general view. This lot was known as the jack pen. On the east end of the north side of the lot there was a board fence, 9 feet in length, and 6 or 7 feet high, which was constructed to serve as a blind to better conceal the inside of the pen. It was on the inside of this pen, with his head, and possibly his shoulders, resting against the west part of this blind, or against the boards on the west end of it, with his body extending to the south, that Faulk was found dead. We say that the body of Faulk was found, with his head and possibly his shoulders resting against the west post or the board of the blind, because the evidence is not absolutely in accord as to the exact position of the body in that respect. According to the evidence of the deputy coroner, the body was reclining against the north wall of the jack pen, seated in a semireclining position. According to the evidence of Ophe and Otis Hebert, who reached the scene sometime before the coroner did, and very shortly after Faulk came to his death, Faulk was lying on the ground on the inside of the pen, with his feet towards the south, and with only his head resting against one of the posts of the blind.

The exact position of the body has some bearing on the case, for, from 7 to 8 feet south of the north wall of the pen, running in a slightly slanting direction with reference to that wall, there was a plank nailed to two posts to make the rear end of what was known as the mare pen. This plank was 3 feet long, 6 inches wide, and 1 inch thick, and was nailed to posts at a point 2 feet from the ground. Hence the top of the plank was 2½ feet from the ground. It is the theory of plaintiff that Faulk rested his gun, a single-barrel shotgun, against the opposite side of this plank, while attending to his stock, perhaps before leading his jack, which was kept in the pen at night, to the well to water it, and when he wanted the gun, he caught it by the barrel, and, in pulling it over the board, the hammer caught, was prized upwards, and, when released, fell, and exploded the cartridge, causing the death of Faulk.

When Faulk went to the barn on the morning of his death, he went, as some farmers frequently go to their morning work, barefooted. By the preponderance of evidence he had on only one shirt, and that was an undershirt, and wore, besides that garment, a pair of blue overalls. When he was found lying in the jack pen dead, the bib of his overalls was hanging down, his undershirt was unbuttoned, and the left side of it was thrown, or had slipped, to the side before he came to his death, for neither the bib of the overalls nor the undershirt was penetrated by the shot.

The shot entered the body about an inch and a half below the left nipple, and about a half inch to the left of the breastbone. When the shot entered, it is not known positively what range they took, though the deputy coroner thought, and doubtless correctly so, that they penetrated the heart. The wound that was made was a little larger than one's thumb, or, as some witnesses express it, about the size of a 25-cent piece. There were no scattered shot holes around the wound. The body was powder burned around the wound for 4 or 5 inches. Hence it appears that the gun was fired, whether accidentally or not, when the muzzle of it was against the body, or so close to the body that the shot had no opportunity to scatter.

When the body was seen by Ophe Hebert, and at the time. the coroner saw it, the gun of the deceased was lying a few inches to the left of his body, the butt near or not far from his left foot, and the barrel extending towards his head. His left arm was extended along the side of his body, and his left hand was open. The deputy coroner testified that the deceased held in his right hand a stick, about 18 inches in length and ⅞ of an inch thick, which looked to him as if it were a piece of an old buggy spoke. On the other hand, Ophe and Otis Hebert, who saw the deceased very shortly after he came to his death, testified that, while his right hand was closed, yet the deceased held no stick in it. The position of the defendant is that the deceased did have this stick in his right hand and used it for the purpose of springing the trigger, after putting the muzzle of the gun against his heart.

As stated by us above, Faulk owned no real estate. His only sources of revenue were his farming operations and his jack. His assets consisted of his household effects, a few head of stock, a Buick automobile, some farming implements, his rice crop, and some corn and potatoes. Exclusive of his crop, the assets mentioned, were appraised, 10 days after his death, at approximately $2,500, though they sold some months later, due to a considerable slump in the value of property, which in the interim had occurred, for considerably less than the appraisement, but the appraisement gives some idea of the value of this property at the date of Faulk's death. Faulk had planted 120 acres to rice, a part of which was on the eve of maturing, when he came to his death.

There were some vague rumors in circulation among the farmers at the time of Faulk's death to the effect that the approaching rice crop would be sold at a loss. Whether Faulk ever heard of these rumors does not appear. It does appear, however, that a few days before his death he had a conversation with a rice farmer in the neighborhood, relative to the prospects for rice, in which he expressed the view that, if rice sold for as much as $10 or $12 a sack, the year would be a good year. While this is a small circumstance, still it indicates that Faulk was hopeful. As a matter of fact, rice was not then selling at $10 or $12 a sack. There was no new rice on the market in Vermilion parish until August 15th, 5 days before Faulk's death. The new rice, then placed on the market, sold for from $5 to $8 a sack, and some farmers refused to sell at $8, expecting to get more, but even at those prices the situation for Faulk was not hopeless. It was not until after Faulk's death that the crash in the rice market came.

We gather from the record that Faulk was not given to fits of despondency, but was a man of even temperament. His relations with his family were good. On the night prior to his death, as we have had occasion to say, he slept well, and arose in the morning, apparently in good spirits. On the day prior to his death, on returning from Abbeville, he stopped and talked a few minutes to a farmer living in the neighborhood. The evidence, given by the farmer to whom he talked, shows that he appeared to be in his usual mood, from which we infer that there was nothing exceptional in his manner, and that he seemed to be at least in ordinary spirits. There is nothing in the record showing that he was brooding over anything prior to his death. At the time of his death, he was apparently sane, and was enjoying good health. In fact, the evidence discloses that his health had always been good.

[1] Before stating our conclusion, based on the foregoing statement of facts, it is necessary that we consider several questions of law that have been raised, or which present themselves for consideration. One of these questions is, What effect, if any, should be given to the verdict of the coroner's jury?

In the case of Webster v. New York Life Insurance Co. (No. 25597) 107 So. 599, post, p. 854, it was said, in speaking of the verdict of a coroner's jury, that:

"The formal report of a coroner's jury is at best but the weakest kind of evidence. Leman v. Life Ins. Co., 15 So. 388, 46 La. Ann. 1189, 24 L. R. A. 589, 49 Am. St. Rep. 348; and, 'by the weight of authority, however, while such verdict is competent to be received in evidence as part of the proof that the death occurred, it *is not even prima facie competent as tending to* prove the cause of such death; and this is true when it is introduced by either party.' 13 Corpus Juris, p. 1256; 37 Corpus Juris, p. 633, § 436. See, also, text and note 13, p. 634."

We are inclined to the view that such a verdict is not competent to show whether the deceased committed suicide, but to show only the fact of death; and, when received in evidence without restrictions, is entitled to no weight on the question of suicide vel non. Hence we shall give the verdict no weight in deciding that question.

[2-4] Another question which it is necessary to consider before stating our conclusions, based on the foregoing statements of facts, is one relating to the admissibilty of evidence. The plaintiff in rebuttal sought to show by Ophe Hebert the way in which a part of the jack pen was constructed, by showing that a plank was nailed about 2 feet from the ground across the north end of what is referred to in the evidence as the "mare's pen." The purpose of this evidence was to show that it was one of the possibilities that Faulk rested his gun against the opposite side of this plank, and that he later, in regaining possession of it, carelessly pulled it over the board, and, in doing so, accidentally discharged the gun, thereby causing his death. Plaintiff also attempted to prove by the same witness that, when he (the witness) saw Faulk's body, shortly after Faulk met his death, the deceased had no stick in his hand. This evidence was objected to by defendant on two grounds. One of these was that the evidence offered was not evidence in rebuttal, but evidence which plaintiff should have offered in chief, and the remaining ground of objection was that the witness was a member of the coroner's jury, and that the effect of his evidence, if given, would be to impeach his verdict, when the law does not permit a witness who was a member of the coroner's jury to give evidence that would impeach his verdict. The court overruled both grounds of the objection, and defendant, in its brief, complains of the ruling.

We find no error in the ruling. The burden was on defendant to establish that the insured committed suicide. Webster v. New York Life Insurance Co., supra. Defendant had offered evidence to show that the insured had committed suicide. It was competent, therefore, for the plaintiff, in rebuttal, to show any fact which would tend to negative the theory of suicide. The fact that plaintiff, at the opening of the case, in anticipation of the defense of suicide, offered evidence, which, strictly speaking, was more properly evidence in rebuttal than evidence in chief, did not deprive her of the right to offer evidence, after defendant had closed, rebutting the theory of suicide. Nor do we think that the objection that the witness, Ophe Hebert, by whom, among others, it was sought to establish the facts, here offered in rebuttal, was a member of the coroner's jury, rendered Ophe Hebert incompetent to testify to those facts. The purpose of the evidence, here offered, was not, properly speaking, to impeach the verdict rendered by the coroner's jury. Its sole purpose was to elicit from the witness certain facts, supposed to be within his knowledge, which had no connection with the regularity or validity of the verdict of the jury of which he was a member. The only evidence in the record, which possibly could be considered as an attempt to impeach the verdict of the coroner's jury, has not been considered by us, because the death of the insured is admitted,

and because, for reasons stated above, we have attached no weight to the verdict finding that the deceased committed suicide. Hence we have found no reason to consider that particular evidence, or even to mention it, in our statement of facts.

Having considered the foregoing questions of law, we shall now state the conclusions we have reached, based on the evidence, the material parts of which have been stated by us above.

In our view, there was nothing strange or unusual in Faulk's taking his gun with him to the barn on the morning of his death. His rice field commenced only a few yards from the barn. A part of his rice was about to mature, and birds, including marsh hens, were beginning to feed on the grain, especially of mornings and late of afternoons. In order to protect his rice, he hunted these birds, and killed or drove them off with his gun. Sometimes he hunted them for a while in the morning, after feeding his stock, and before returning to the house for his coffee, and at other times after so returning.

With reference to the position of the body, the condition of the clothing, and the other circumstances connected with or surrounding the unfortunate occurrence, these circumstances do not, in our opinion, exclude every reasonable hypothesis except the one that the deceased committed suicide. The fact that the bib of the overalls, worn by the deceased, was hanging down, when his body was discovered, and that his undershirt, the only shirt which, according to the weight of the evidence, was worn by him, was unbottoned and lying open sufficiently to expose a part of the left breast where the shot entered the body without touching the clothing, may be explained on an hypothesis consistent with the theory of death by accident. The morning on which the death occurred was a morning in the month of August. Faulk, it may be said, only half dressed himself to go to the barn to attend to his work. There was no reason why he should have dressed even with ordinary care. He went to his work barefooted, and, the morning being a summer morning, it is not unlikely that he did not take the trouble, or did not care, to button his undershirt, or to wear his overalls with the bib up, but let the bib hang and let his undershirt remain unbuttoned, for the purpose of remaining as cool as possible in attending to his work. Under such circumstances, it would not be unlikely that the left side of his undershirt fell to the side while he was doing his work, or when he reached for his gun, if he rested it against anything, and when the gun was discharged the shot entered the body, penetrating the heart, without touching the clothing.

The fact, if it be a fact, and we shall assume it to be such, that, when Faulk's body was found, he had a stick in his right hand of sufficient length to have enabled him to discharge the gun with suicidal intent, may also be explained consistently with the theory of death by accident. He may have had the stick for any number of purposes at the time the gun was discharged. He may have picked it up to use for some purpose about the place, and then reached for his gun, and, in regaining possession of the gun, accidentally discharged it, and, meeting with instant death, the stick remained clutched in his hand.

The position of the body resting in a semi-reclining position, with the head and shoulders against the north wall of the jack pen, or with the head only against that wall, may be explained on a theory inconsistent with the one suggested by defendant, to the effect that Faulk, in order to more easily and effectively discharge the gun, seated himself against the wall of the pen. It is established that he kept his jack at night in the jack house, which adjoins the pen on the east; the entrance to the jack house being through the

pen. It is also established that a few minutes before his death he took his jack to the well to water it, and then led it to the pasture. It is not at all unlikely that, in going for the jack to water it, he rested his gun against the opposite side of the board that was nailed across the north end of the mare pen, and when he went back to get the gun he carelessly grabbed it by the barrel, and pulled it over the board, and in that way accidentally discharged it. If Faulk so placed his gun, in all likelihood its barrel leaned over the board towards the north wall of the pen, which wall was only 7 feet at one point and 8 at another from the board. Faulk was 5 feet 10 or 11 inches tall. If he turned and caught the gun by the barrel, while in front of it, a wound of the description proven might well have been inflicted, and Faulk have fallen with his shoulders and head, or his head, against the north wall of the pen.

[5-7] We have considered separately, above, each of the material circumstances relied on by defendant, in order to more clearly show the weight to which each is entitled. However, in reaching a final conclusion, all of the circumstances of the case should be considered together, for it is possible that, while each circumstance, considered separately, may admit of such explanation as to apparently entitle it to but little weight, yet, when all of them are considered together, it will be found that they exclude every reasonable hypothesis, save the one sought to be established. However, when we consider all of the circumstances of the case together, they still leave it doubtful whether the insured intentionally killed himself, for it may well be, under all of them, that he was accidentally killed, in the manner indicated above, or in some similar manner. There is a strong legal presumption against the commission of suicide. The litigant alleging its commission must establish the fact, and, when he relies on circumstantial evidence to do so, must establish it to the exclusion of every other reasonable hypothesis. Webster v. New York Life Insurance Co., supra; Eckendorff v. Mutual Life Insurance Co., 97 So. 394, 154 La. 183; Kohlman v. New York Life Insurance Co., 92 So. 132, 151 La. 607; Valesi v. Mutual Life Insurance Co., 91 So. 818, 151 La. 405.

We might be inclined to hold, in this instance, that the insured committed suicide, if the circumstances, tending to show self-destruction, were supported by a motive. The evidence, however, fails to show a motive for such an act, but indicates, as far as it goes, that none existed. The insured was in good health, and had never had any serious illness in his life. He was on good terms with his family. It does not appear that he was brooding over anything. He apparently slept well the night before his death, and on the day prior thereto he seemed, in conversation, to have been in good spirits. It is true that there had been a considerable decline in the price of rice since spring, but at the time of his death the price of rice was not such as to have made his financial condition, by any means, appear hopeless. In fact we know that, 2 or 3 days prior to his death, he expressed the view that, if rice sold for $10 or $12 a sack, it would be a good year for him, which shows that he entertained some hope that it would sell at one of those prices. There is not the slightest suggestion that the insured committed any offense or act which might have driven him to suicide. The fact that Mrs. Faulk, when she saw smoke coming apparently from the west side of the barn, while on her way to the well for a bucket of water, started to the barn, but hesitating, as it were, to go alone, got her children and went to the jack pen, which was west of the barn, and found her husband dead, does not disclose, as contended by defendant, that there was a motive for suicide, which caused Mrs. Faulk to fear that her husband might com-

mit the act. She hardly would have taken her children with her had she anticipated that she and they would have seen so gruesome a sight. Moreover, she explains her action by saying that she thought that possibly the hay about the barn was burning, and that she took her children with her because something might be needed.

On the whole, the record fails to disclose a motive for the act, and, no motive appearing, the evidence, in this instance fails to exclude the hypothesis of death by accident.

With reference to motive, this court, after citing authorities to show the importance that courts have always attached to it in this class of cases, said:

"Of course where the suicidal act is shown by *direct evidence* of eyewitnesses, or suicide notes or declarations of intent, there is no need to resort to circumstantial evidence; and hence no need to lay special stress on motive, nor, perhaps, where the physical conditions surrounding the death are such as to leave no possible room for doubt. * * *

"But where there is no direct evidence as to the suicidal act, and no suicide note or the like, and the other circumstantial evidence leaves the scales evenly balanced between *suicide* and *accident*, then the one final circumstance, which must turn the scale, is *motive or lack of motive* for the act. * * *" Webster v. New York Life Ins. Co., supra.

And the court, in the same case, the Webster Case, after reviewing the jurisprudence of the state, in this class of cases, said:

"The general purport of those decisions (referring to the decisions reviewed) is that, while other circumstances are to be considered, nevertheless *motive* is not alone one of many minor circumstances to be considered along with others, but is of itself the one *major circumstance* and prime consideration on which the whole case generally hinges."

The reason for attaching prime consideration to motive, as appears from the same case, is:

"That, although the physical evidence may show unmistakably that the deceased killed himself, nevertheless it does not usually show with the same certainty whether he did so intentionally or unintentionally, and hence that

160 LA.—18

fact must be ascertained by inquiring whether the deceased had or had not some strong motive for taking his own life. In other words, the physical facts tend principally to show whether or not the deceased died by his own hand; whilst the evidence as to motive bears principally on the intent of the deceased at the time he killed himself. If the deceased had no strong motive for taking his own life, the presumption would be that he did so *accidentally;* on the other hand, if he *did* have some strong motive for doing so, the inference naturally is that he did so *intentionally.*"

[8-10] Our conclusion in this case is that the evidence fails to show to the exclusion of every other reasonable hypothesis that the insured committed suicide. Hence plaintiff is entitled to what the policy terms the face amount thereof; that is to say, to the $3,000. payable upon proof of the death of the insured from other than an accidental cause of the description specified in the policy. Plaintiff, however, as we have seen, claims more than the face amount of the policy, for she sues for the double indemnity, specified therein, payable when the death of the insured is caused by bodily injury, effected solely through external, violent, and *accidental* means. The burden was upon her to prove that the death was thus caused, to recover the double indemnity. Canal-Commercial Trust & Savings Bank v. Employers' Liability Assurance Corporation, 99 So. 542, 155 La. 720; Webster v. New York Life Insurance Co., supra. The question therefore is, Has plaintiff carried this burden? There can be no question that the death of the insured was caused by bodily injury, effected through external and violent means. But the question also is, Were those means accidental, or, in other words, was the death accidentally caused by those means? As stated in the foregoing excerpt from the Webster Case, when the evidence shows that the insured killed himself, but leaves it doubtful whether he did so intentionally or accidentally, the presumption is that he killed himself accidentally. See also Canal-Commercial Trust & Savings Bank v.

Employers' Liability Assurance Corporation, supra. In this instance, the evidence does not reasonably admit of any other conclusion save the one that the insured killed himself. Both sides apparently concede that fact in their discussion of the case; the only difference between them, with reference to the death of the insured, being, did he kill himself intentionally or accidentally? As it is doubtful whether he killed himself accidentally or intentionally, the presumption is that he did so accidentally. Hence plaintiff is entitled to the double indemnity. Such, we may add, was the conclusion of the trial judge.

For the reasons assigned, the judgment appealed from is affirmed; appellant to pay the costs.

ROGERS, J. I dissent, because in my opinion the evidence shows that the insured committed suicide.