THOMPSON, J.
 

 This is a suit for $3,000, the face value of a policy which insured Walter Leaumont against death by “bodily inju
 
 *161
 
 ries effected directly and independently of all other causes through accidental means.”
 

 'The plaintiff also demands an additional $3,000, or double indemnity and attorney fees, because the company failed, without just and reasonable grounds, to make payment within 30 days after proofs of the death of the insured had been filed with said company.
 

 The lower court gave judgment for the amount 'of the policy, but rejected the penalty of double indemnity and attorney fees.
 

 The plaintiff has answered the appeal and asks for the full amount demanded.
 

 In the recent case of Brown v. Continental Casualty Co., 161 La. 229, 108 So. 464, we held that—
 

 “In action for indemnity for death under health and accident policy, beneficiary may not recover double indemnity and attorney’s fees under Act No. 310 of 1910, imposing such penalties only in cases of illness or accident.”
 

 In the case of Faulk v. Mutual Life Insurance Co., 160 La. 530, 107 So. 395, double indemnity was allowed, not however under the Act of 1910, but because the policy expressly provided for such double indemnity if the death of the insured resulted “directly from bodily injury, received after the date of issue of this policy, independently and exclusively of all other causes, and that such bodily injury was effected solely through external, violent and accidental means.”
 

 There is no provision for double indemnity in the instant policy as was the case in the Faulk policy, hence the allowance of double indemnity in the Faulk policy cannot serve as precedent in the present case.
 

 Under the ruling in the Brown Case, which we adhere to, the demand for double indemnity and attorney fees was properly rejected by the lower court.
 

 The defense to the suit is a denial that the death of the insured was accidental within the meaning of the policy, and it is alleged that the insured took his own life purposely and intentionally.
 

 It is undisputed that the insux’ed died from the effect of a shot discharged from a pistol which he held in his hands at the time. It had been- his habit for many years to keep a pistol at his house and to load it ht night and place it under his pillow or on a table near his bed. The first thing in the morning on arising from the bed he would unload the pistol and put it away.
 

 On the morning of his death the insured, while still in bed, picked up the pistol and, as it is claimed, proceeded to break and unload it, when the pistol was discharged. The ball entered the right temple just in froixt and adjacent to the upper portioix of the ear, ranged upward, and lodged under the skin on the left side of the head. He was rushed to the hospital and died shortly thereafter. The coroner issued a certificate to the effect that the death was accidental.
 

 The insured was a widower with several children. His wife had been dead for some two years or more, and he and his children lived in the house with his wife’s parents.
 

 About 6 o’clock on that morning, Mr. Michel, the father-in-law of Leaumont, carried him some coffee and asked him how he felt, and he replied: “I feel fine. I had a good night.”
 

 Michel remained with him for about 30 minutes, during which time Leaumont asked him to make his son who was seven years old to read some to him and to make some figures. It seems that the boy had been promoted from the first to the third grade, and his father seemed very proud of it. Mr. Michel then prepared some coffee and carried it to his wife and the balance of his family. He again opened the door leading onto the porch where Leaumont was sleeping and asked him if he wanted anything, and he replied in the negative and again asked him not to forget to question his little boy.
 

 Just before the shot was fired Mr. Michel was tieing his necktie and suggested to the boy that he hurry up and get off to school.
 

 
 *163
 
 They were in an adjoining room to the porch where Leaumont was sleeping, and Michel could only see the outline of Leaumont on the bed through the glass doors which opened .onto the porch.
 

 Michel says he saw Leaumont’s arms go up and then he heard the shot. He rushed onto the porch, saw what had happened, and immediately summoned a priest and a doctor. He saw the pistol broken open lying on the bed.
 

 Walter J. Leaumont, the 15 year old son of the insured, was in the adjoining room about eight feet from his father, and when he heard the shot he rushed to his father's bed, where he found him in a kind of sitting position with the pistol open and in his lap.
 

 The deceased had been a sufferer from what his attending physician described as insipid tuberculosis, but he had been discharged as having been cured.
 

 The doctor was with him on the day before he was killed and told him he would be able to leave the room and to take dinner on Thanksgiving Day with his family. The doctor testified that on his last visit to him the day before he died, he was cheerful and happy, was laying out his plans for the future, and anticipated with great pleasure the fact that he would soon resume his business activities. He had held a position with a well-known cotton firm in this city for some five or six years at a salary of $5,000 per year.
 

 The evidence in the record not only fails to show the existence of any motive for the taking of his own life, but, on the -contrary, all of the evidence and the surrounding circumstances show many good and substantial reasons for wanting to continue to live.
 

 lie had no financial or family troubles. He was earning a good salary and was moderately well fixed in money matters. He was devoted to his children and justly proud of their educational advancement. His domestic surroundings were peaceful.and happy. 1-Ie never exhibited any despondency, but was always cheerful and happy in disposition.
 

 We find ourselves able after an examination of the record to fully concur with the trial judge in his opinion that the facts shown do not justify the charge that the insured committed suicide.
 

 The rule of jurisprudence is so well established in this state as not to require citation of authority, to the effect that there is a strong legal presumption against commission of suicide and the insurance company alleging such defense must establish it to the exclusion of every other reasonable hypothesis.
 

 “But, where there is no direct evidence as to the suicidal act, and no suicide note or the like, and the other circumstantial evidence leaves the scale evenly balanced between suicide and accident, then the one final circumstance, which must turn the scale, is motive or lack of motive for the act.” Webster v. New York Life Insurance Co., 160 La. S54, 107 So. 599.
 

 And in the case of Faulk v. Mutual Life Insurance Co., supra, we said:
 

 “We might be inclined to hold, in this instance, that the insured committed suicide, if the circumstances, tending to show self-destruction, were supported by a' motive. The evidence, however, fails to show a motive for such an act, but indicates, as far as it goes, that none existed.”
 

 Counsel for the defendant company do not question the correctness of the rule referred to, but contend that the rule does not prevail in accident policies such as here sued on.
 

 It is contended that in a suit for re-, covery under such a policy the plaintiff must first prove the happening of an accident before the insurance company can be put upon its defense.
 

 We think the plaintiff has sustained this burden of proof in this case. The death was caused by the discharge of the pistol while in the hands of the insured, and having arrived at the conclusion that the facts do not establish the act to be one of suicide, it necessarily follows that the killing was accidental.
 

 
 *165
 
 “As stated in the foregoing excerpt from the Webster Case, when the evidence shows that the insured killed himself, but leaves it doubtful whether he did so intentionally or accidentally, the presumption is that he killed himself accidentally.” Faulk Case, supra, and other cases there cited.
 

 We find no confusion in the jurisprudence of this state on the question of burden of proof.
 

 The language of the court in the cases cited is emphatic, clear, and unambiguous, to the effect that in all cases where the evidence shows that the insured killed himself, but leaves it doubtful whether he did so intentionally or accidentally, the presumption of accident will prevail.
 

 Judgment affirmed.