## PECORARO v. NEW YORK LIFE INS. CO.*
### No. 13920.

Court of Appeal of Louisiana. Orleans.

May 2, 1932.

Louis H. Cooke, of New York City, and Montgomery & Montgomery, of New Orleans, for appellant.

Herbert W. Kaiser, Thomas Tomeny, and John H. Hammel, Jr., all of New Orleans, for appellee.

HIGGINS, J.

The widow of Joseph Giardina brought this action to recover the sum of $1,000 alleged to be due under the double indemnity clause of a life insurance policy issued by the defendant company upon the life of her deceased husband, alleging that he was accidentally killed on July 1, 1930, when his pistol exploded, as he tripped and fell down the steps in his home. The company paid the face value of the policy or $1,000 to the beneficiary, but declined to pay the additional $1,000 claimed to be due, averring that the deceased had committed suicide, which was expressly excluded as a risk in connection with the double indemnity clause of the policy.

There was judgment in favor of the plaintiff as prayed for, and defendant has appealed.

The record shows that the deceased was living with his wife and five children at Lutcher, La., where he operated a retail mercantile business until February, 1930, when he moved his family to New Orleans in order to give his children better educational advantages. He opened a retail grocery store on Saratoga street in a negro neighborhood, he and his family living above the store. He kept a .38 caliber revolver in the store during the daytime and carried it upstairs at night for protection. The night before his death he retired about 12:30 o'clock, he and his wife occupying one of the upstairs bedrooms and his children occupying the other two rooms, all of which had connecting doors. Before retiring he stated that it was his purpose to go to the French Market in the morning in order to purchase certain vegetables for his store. He arose about 4:30 a. m., dressed in his working clothes, washed his face and hands, and brushed his teeth. He proceeded down a flight of stairs, which were very steep, with his gun in his right hand, a flash-light and a policeman's billy and his money box in his left hand. His wife, who had also dressed, followed him down the stairs. There is a right-angle turn in the staircase, and after passing that point the gun exploded wounding him and causing his body to fall forward down the stairs coming to rest near a door which led to the outside with one of his feet on the bottom step. The bullet entered the neck of the deceased two inches below his chin, slightly to the right side, passed upward through his brain and made its exit slightly to the left side of his head and then embedded itself in the ceiling of the room. Plaintiff began to scream and cry as well as her daughters who saw their father's body when they came down the stairs. One of the neighbors, a negro woman, attracted by the outcries, came in, and the police were notified, and they in turn summoned the ambulance, and the deceased was taken to the Charity Hospital, where he died three hours later without gaining consciousness.

The relevant provision in the policy reads as follows:—

---

*Rehearing denied May 30, 1932.

"New York Life Insurance Company
"A Mutual Company,
"Agrees to pay

"Beneficiary Frances. P., Wife of the Insured ***————Beneficiary
(with the right on the part of the Insured to change the Beneficiary in the manner provided in Section 7)
Face Amount One Thousand Dollars
(The face of this Policy)
Upon receipt of due proof of the death of Insured ***Joseph Giardina*** the Insured; or Double Indemnity ***Two Thousand*** Dollars        (Double the face of this Policy)
upon receipt of due proof that the death of the Insured resulted directly and independently of all other causes from bodily injury effected solely through external, violent and accidental cause, and that such death occurred within ninety days after sustaining such injury, subject to all the terms and conditions contained in Section 2 hereof."

Section 2 reads as follows:

"Section '2'—Double Indemnity

"The provision for Double Indemnity Benefit on the first page hereof will not apply if the Insured's death resulted from self-destruction, whether sane or insane; from any violation of law by the Insured; from military or naval service in time of war; from engaging in riot or insurrection; from war or act incident thereto; from engaging, as a passenger or otherwise, in submarine or aeronautic operations; or directly or indirectly from physical or mental infirmity, illness or disease of any kind. The company shall have the right and opportunity to examine the body, and to make an autopsy unless prohibited by law."

■ In the case of Eckendorff v. Mutual Life Insurance Company, 154 La. 183, 97 So. 394, 396 (a case involving a pistol shot in the right temple, where the defense was su'cide), the Supreme Court said: "When, in order to avoid liability on a policy issued by it, an insurance company relies on the defense that the insured committed suicide, the burden rests on the company to establish that the insured did commit suicide to the exclusion of every other reasonable hypothesis."

In the case of Webster v. New York Life Insurance Company, 160 La. 854, page 864, 107 So. 599, 603, where the insured died from a pistol shot in his right temple, the defense being suicide, the Supreme Court said:

"It is therefore clear that in a suit on a life or accident insurance policy, where the defense is that the deceased committed suicide, there is but one issue to be resolved, and that is: Do the facts and circumstances proved exclude with reasonable certainty any hypothesis of death by any other means?

"But that is a question of fact, because, like the question of what is the proximate cause of an injury, it is not a question of science or legal knowledge, but each case must necessarily stand on its own particular facts and circumstances."

And on page 880 of 160 La., 107 So. 599, 608, the court further said: "And since it is evident from the testimony, and undisputed that the insured killed himself, whether accidentally or intentionally, it follows that this case presents only two issues, both of fact, to wit: Do the physical facts surrounding the death of the insured exclude with reasonable certainty any possibility of accident? and, if not, Does the evidence show that the insured had such sufficient motive for taking his own life as would overcome the presumption against suicide, and make it reasonably certain that his death was not the result of accident, but of his own deliberate intention to take his own life?"

■ And again on page 892 of 160 La., 107 So. 599, 612, the court held: "And the burden of proof was on defendant to show motive, if motive was essential to overcome the presumption in favor of accident, and establish suicide, for suicide is an affirmative defense, and the burden of proof is on the defendant to show it. Supreme Tent K. M. v. Stensland, 68 N. E. 1098, 206 Ill. 124, 99 Am. St. Rep. 137."

The only eyewitness to the shooting was the plaintiff, the widow of the deceased. She stated that she descended the stairs with her husband in front of her, but suddenly he appeared to trip or stumble, and, as he lurched forward and grabbed for the balustrade with his right hand, the gun exploded, fatally wounding him in the neck and head and causing him to fall forward, as we have already described.

She is corroborated by her daughter, Josephine, age 18, and Virginia, age 16. They testified that both plaintiff and her husband arose early and dressed in their working clothes, and that their father went down the stairs first with the gun in his hand; that they did not see the firing of the shot that killed him, but that when they heard the shot and the screams of their mother that they rushed to her and found their wounded father lying at the foot of the stairs with one foot resting on the bottom step.

A colored woman by the name of Carrie Maze was the first neighbor to reach the scene, and she testified that she found plaintiff crying and screaming and holding her husband's head in her arms at the foot of the steps; that she notified the police and had a pillow placed under the dying man's head in order that he might be more comfortable; that she bathed his face with water; and that she remained there while the police were there and until the ambulance took the deceased away.

Defendant proved by Coroner Roeling that the cause of death was the gunshot wound in the neck and head, and that for one-quarter of an inch in a circle around the place where

the bullet entered the neck there were powder burns. He identified the coroner's report and the plaintiff's statement taken before the coroner's jury. The official finding was death from the result of a self-inflicted wound. The deceased was described as being an Italian, male, white, age 45 years, 5' 9" tall, weight 195 pounds.

Corporal Denis V. Patachon, a witness for defendant, identified his suicide report and testified that he and Patrolman Lawrence Montalbo arrived at the home of the deceased about 5 o'clock in the morning in response to a telephone message; that when they arrived there he found the deceased on the floor in the vicinity of the foot of the stairs with his head on a pillow which had considerable blood on it; that he questioned the plaintiff, who was in a highly nervous condition concerning the shooting, and that she stated to him that her husband had shot himself because he had low blood pressure; that he also spoke to one of plaintiff's daughters (but he was unable to identify her) and stated that she told him that her father had gone downstairs to take his medicine, had placed a pillow under his head, and had shot himself. He further testified that the dying man attempted to speak to him, but that plaintiff said something to her husband in Italian, and that thereafter he was unable to get any response from him.

Patrolman Lawrence Montalbo, a defense witness, makes the same statements as to the physical conditions upon his arrival, but does not corroborate the corporal as to what plaintiff said or what her daughter said, or that the deceased was about to give a statement when his wife in Italian apparently advised him not to do so.

Carrie Maze, plaintiff's witness, likewise failed to hear these conversations, although she was present bathing the dying man's face.

Captain Joseph Sonnenberg, qualified as an expert on firearms, stated that in his opinion the .38 caliber Smith & Wesson special revolver, from which the shot was fired that killed the deceased, could not be exploded by striking the trigger guard or the rear of the hammer against the balustrade. At the suggestion of the court he gave demonstrations which corroborated his statements. He also verified his opinion, by experiment, that the wound was inflicted when the pistol was within one foot of the deceased's throat on account of the small area—one-quarter of an inch—of powder burns surrounding the wound in the neck.

Raymond De Lord, a defense witness, testified that he was the clerk in the coroner's office, and that he wrote out on the typewriter the statement dictated by plaintiff in the coroner's office the day of her husband's death, but on cross-examination he admitted that the statement was not taken in shorthand and not written verbatim, although he was quite sure that he had correctly written down what was said. This statement consists of questions and answers covering about one-half of a page.

Dr. Carroll W. Allen, who treated the deceased from May 20, 1930, to May 25, 1930, testified as a witness for the defendant, and stated that the deceased was suffering from low blood pressure due to the fact that he was working seven days a week from early morning until late at night in the store without proper rest; that he found nothing seriously wrong with the man and directed him to rest. The doctor ordered him to the Baptist Hospital, where deceased remained for five days under observation and then, assuring the doctor that he felt better, he left the hospital and did not return to the doctor's office for treatments, although he had promised to do so. The doctor also stated that there was nothing about the man's condition to cause any alarm, and that he did not say anything to him which would have caused him to become apprehensive about his health. He further testified that Giardina had stated to him that business was bad on account of the depression, but that the deceased's views in that direction were no worse than any other man with whom you might have met and talked at that time. He stated that low blood pressure causes one to be depressed physically, but in no way impairs the mind.

Dr. Doussan, the family physician, a plaintiff witness, testified that he had known the deceased for a great many years and had attended his wife at the birth of all of her children; that the deceased suffered from low blood pressure, which caused him to be depressed physically, i. e., fatigued and tired; that all he needed was to be toned up and prescribed a vacation for him; that deceased was always healthy, except at one time when he treated him for a tendency towards diabetes, which was cured; that there was nothing in the condition of his health to cause any apprehension or alarm; and that the deceased did not appear to him to be discouraged about his health.

Plaintiff established by her own testimony, that of her two daughters, her brother, her nephew, who was a student at Loyola University where he was studying to be a dentist, her sister-in-law, Dr. Doussan, the family physician, Mr. Dulitz, who is the president of the Merchants Tailors, George Howard, a policeman, and Theodore Hirtzler, a pipe fitter, that she and her husband had lived happily together for 20 years, he being 45 years of age and she being 42 years of age; that there were seven children born of the marriage, five living and two deceased; that the deceased's domestic life was happy; that he was a kind father and a devoted husband; and that he provided very well for his family. These witnesses also testified that the

deceased was enjoying a profitable business and making a good living; that his store was very well stocked with merchandise; that he had a delivery truck and at the time of his death had $570 in cash in the bank—this is corroborated by the bank's statement— with outstanding bills amounting only to $200.

From the medical and lay testimony it appears that the deceased was in sound health except for the fact that he was overworked and needed rest and recreation in order to correct the low blood pressure, which was a mere sympton that he was overtaxing his constitution by working too many hours a day and too regularly, without recreation and sufficient rest.

These witnesses also gave testimony tending to show that the deceased was of a jovial and affable disposition, in good spirits up to the very night before he was shot, and that he had planned the morning he was killed to rise early for the purpose of going to the French Market to get some merchandise; that he had had his clerk order him a new check book in order to pay his current bills, which he had prepared to make checks for and to send out during the day he was killed.

Counsel for defendant contends that the circumstances under which the deceased met his death reasonably excluded the possibility of accident, and that defendant has proved that the motive of the deceased in taking his life was his poor health. Counsel for defendant points out that the plaintiff, in a statement made in the coroner's office, said that she was up stairs at the time her husband shot himself, and therefore did not see the occurrence. He argues that her statement should be disbelieved on that ground, and also because Corporal Patachon stated that at the time he interviewed her at the scene of the killing she stated that her husband had shot himself because of his low blood pressure. Mrs. Giardina denies that she made these statements. The testimony of Carrie Maze and Officer Montalbo tends to corroborate her because these two witnesses were present and did not hear her make the alleged statements.

We might say at this point that it is difficult for us to understand Corporal Patachon's assertion that when the deceased, in his dying condition, was apparently trying to speak to him, plaintiff told her husband something in Italian and that he then did not speak, because the overwhelming testimony in the record shows that the bullet entered the brain of deceased, and that he was unconscious at the time.

We also find it hard to appreciate the corporal's statement that one of deceased's daughters said that he went downstairs, laid his head on a pillow, and shot himself, for, if the deceased had laid down with his head on the pillow and shot himself—the bullet entering the neck two inches below the chin and coming out the top of his head—the bullet would not have lodged in the ceiling, but in one of the walls of the room.

The corporal found a large swollen spot over one of the deceased's eyes and said he thought it was the place where the bullet had lodged, but this bruise was evidently caused by the deceased falling to the floor on his face, when he tripped and fell down the steps; thus again showing that deceased could not have shot himself while lying on the floor with his head on a pillow.

Plaintiff and Louis Dulitz both testify that they went to the coroner's office, after reading the newspaper articles of the coroner's jury's finding of suicide, for the purpose of having the suicide report corrected so as to show that the shooting was accidental.

But, even if we entirely eliminate plaintiff's testimony, we do not believe that would help the defense, unless we also disregard all the other evidence in the case offered by the plaintiff, and it is not even contended that we should go that far.

In the case of Webster v. New York Life Insurance Co., supra, on page 887 of 160 La., 107 So. 599, 611, the court said:

"There they found Webster in his underclothing and bare feet, sitting on a canebottomed stool which stood between a 'dressing table' or 'dresser' and the foot of the bed; his body lying back on the bed, with his right hand on his right leg, near a pistol, which lay on the stool between his legs.

"He was 'bleeding from the mouth,' and the coroner found a bullet wound in his right temple, but 'no powder marks.' Judging 'from the wound and the course of the bullet,' the coroner 'would say that he shot himself with the revolver'; but he was very properly not allowed to answer plaintiff's counsel as to whether he thought the wound was accidental or intentionally inflicted. The coroner's official finding was 'suicide.'

"As Mr. Russell saw the body of his brother-in-law, he exclaimed, 'Oh, my God, he is dead'; or he has 'shot' or 'killed' himself, or he has 'committed suicide.' He says he thinks he said the first. The police say they think he said the last, or 'something of the kind.'

"His exclamation at the time, whatever it was, was good evidence of what he thought at the time. But his opinion, whether at that time or at any other, is of no value whatsoever as to whether the death was an accident or suicide for even the formal report of a coroner's jury is at best but the weakest kind of evidence. Leman v. Life Ins. Co., 15 So. 388, 46 La. Ann. 1189, 24 L. R. A. 589, 49 Am. St. Rep. 348; and, 'by the weight of authority, however, while such verdict is competent

to be received in evidence as part of the proof that the death occurred, it is not even prima facie competent as tending to prove the cause of such death; and this is true when it is introduced by either party.' 13 Corpus Juris, p. 1256; 37 Corpus Juris, p. 633, § 436. See, also, text and note 13, page 634."

See, also, Phillips v. Equitable Life Insurance Co., 26 La. Ann. 404, 21 Am. Rep. 549, and Galt v. Travelers' Ins. Co. (La. App.) 141 So. 105, decided April 18, 1932.

It is our opinion that the overwhelming evidence in the case shows that there was no motive for the deceased to have committed suicide; that he was in a normal state of mind, no serious impairment of his health, in good financial condition, operating a profitable business, and his domestic relations were happy both with reference to his wife and his children. The amount of the policy would not warrant us in believing that he would have committed suicide for the purpose of giving his family the benefit of the proceeds of the policy. The evidence satisfies us that deceased was shot while he was descending the stairs. It would seem strange that, if he contemplated committing suicide, he would have chosen such an odd place as the steps to commit the act.

In the case of Webster v. New York Life Insurance Company, supra, the Supreme Court said: "And, for the rest, 'the freaks of a gun (or pistol) when not carefully handled (even by a sober man) are sometimes wonderful.' Boynton v. Equitable Life Assurance Society, 29 So. 490, 491, 105 La. 202, 204 (52 L. R. A. 687). How much more wonderful may not such freaks be, when the gun is handled by a drunken man?"

Captain Sonnenberg, the firearm expert of the defendant, on cross-examination, testified as follows: "Q. You have heard of guns going off without any explanation of their going off, haven't you, that you couldn't see any reason why they should have gone off? A. Well, I never have, Mr. Kaiser. They claim that that has happened, but I never saw that. There has got to be a reason for a gun to go off. We had a similar instance of a gun going off accidentally that the police officers, themselves, said that they can't understand how the gun would have exploded and they shoot themselves, but after just a little bit of questioning and investigating, it is easy to see what made the gun go off and the officer shoot himself."

This expert stated on cross-examination that, while in his opinion the gun could not have been exploded by striking the trigger guard or rear of the hammer on the balustrade, he would admit that it was possible for the deceased at the time that he stumbled and fell to have accidentally pulled the trigger of the gun, which "appears to be a very quick shooting gun," and shot himself.

We have carefully read the record and the decisions of the Supreme Court on this question, and particularly the Webster Case, which is an exhaustive opinion covering the law on this subject in Louisiana, and have reached the conclusion that the circumstances under which the deceased met his death do not reasonably exclude the possibility of accident, and that no serious or sufficient motive has been shown for the deceased to have destroyed himself. Leman v. Manhattan Life Insurance Company, 46 La. Ann. 1192, 15 So. 388, 24 L. R. A. 589, 49 Am. St. Rep. 348; Boynton v. Equitable Life Assurance Soc., 105 La. 204, 29 So. 490, 52 L. R. A. 687; Michel v. London & Lancashire Indemnity Company of America, 162 La. 160, 110 So. 186; Faulk v. Mutual Life Insurance Co., 160 La. 529, 107 So. 395.

For the reasons assigned the judgment appealed from is affirmed.

Affirmed.

JANVIER, J. (concurring).

In several of the cases cited, the facts were at least as suspicious of suicide as are those here. In those cases the Supreme Court held that suicide had not been established to the exclusion, with reasonable certainty, of every other hypothesis.

Although here the evidence of suicide is abundant, nevertheless, in my judgment the possibility of accident has not been excluded with that reasonable certainty which is necessary under the decisions referred to.

I concur in the decree.