153 So. 26

### ANDREWS v. PROVIDENT LIFE & ACCIDENT INS. CO.

No. 32565.

Jan. 29, 1934.

Rehearing Denied Feb. 26, 1934.

Hawthorn, Stafford & Pitts, of Alexandria, for appellant.

Johnson & Kantrow, of Baton Rouge, for appellee.

ROGERS, Justice.

On March 28, 1927, the Southern Surety Company, of Des Moines, Iowa, issued an accident insurance policy to George Y. Andrews. The policy was for $5,000, and provided indemnity for loss of life or bodily injury suffered by the assured, "solely through external, violent and accidental means * * * while driving, riding in or on * * * or in consequence of being struck, run down or run over by an automobile." Mrs. Hallie H. Andrews, the wife of the assured, was named as beneficiary in the policy. Subsequently, the obligations of the Southern Surety Company under the insurance contract were assumed by the Provident Life & Accident Insurance Company, of Chattanooga, Tenn.

On April 6, 1932, while the policy was in force, the assured, George Y. Andrews, was struck and killed by a passenger bus owned and operated by the Interurban Transportation Company, Inc., of Alexandria, La.

Mrs. Hallie H. Andrews, the beneficiary, submitted the required proofs of death, and, upon the refusal of the insurance company to pay the stipulated indemnity of $5,000, brought suit for its recovery. The insurance

company denied any liability on the policy, setting up as a defense to plaintiff's suit that Andrews, the assured, was not killed in an accident, or through accidental means, but that, on the contrary, he was killed when he intentionally ran into the path of the moving bus, for the purpose of committing suicide.

There was judgment below in favor of plaintiff, and defendant has appealed.

The policy sued on, among other things, provides: "This insurance shall not cover suicide or any attempt thereat, sane or insane; nor injuries, fatal or otherwise, sustained by the insured  *  *  *  or caused by the intentional act of the insured."

■ The defense of suicide in an action on a policy of life or accident insurance is a special defense, and the burden of proof is on the insurer to establish that defense by a fair preponderance of the evidence.

In Webster v. New York Life Insurance Co., 160 La. 854, 107 So. 599, where the insured was found dead with a bullet wound in his right temple and the defense was the insured had committed suicide, this court held that in a suit on an insurance policy the burden is on plaintiff to show the death resulted from accident and not from natural causes; but where it is doubtful from the evidence whether death was the result of an accident or of suicide, the presumption against suicide will prevail and be decisive of the case unless overcome by testimony sufficient to outweigh the presumption.

The court further held in the same case that when in order to avoid liability on a policy of life or accident insurance the insur-ance company relies on the defense the insured committed suicide, the burden rests upon the company to establish the suicide to the exclusion of every other reasonable hypothesis.

The rules of law announced in the Webster Case were approved and followed in Faulk v. Mutual Life Ins. Co., 160 La. 530, 107 So. 395.

There are also a large number of cases in other jurisdictions, many of which are cited in the Webster Case, where the same rules of law were applied.

■ The legal principle applied by the courts, that it is the insurer's duty to prove suicide, is founded on a well-recognized rule of human behavior. Self-destruction, the courts say, is contrary to the general conduct of mankind. The love of existence is so firmly implanted in the human heart and men cling to life with such intensity, that the presumption is wholly against the theory of self-destruction.

■ The record discloses that the assured left the home of his niece, Mrs. Jennie Andrews Wilson, in Walnut Ridge, Ark, early in the morning of April 5, 1932, for Baton Rouge, La. He drove his own car, an Essex Sedan, and due to some distributor trouble, he was compelled to spend the first night in Texarkana, Ark. The following morning he drove into Shreveport, reaching there about 9:30 o'clock. After spending a short time with his mother-in-law and sister-in-law, he continued his trip, passing through Alexandria, La., in the afternoon. While drinking a cup of coffee at the Rapides Hotel in Alexandria, he met Mr. John M. Dameron, with whom he had some conversation. The assured left Alex-

andria for Baton Rouge shortly after 5 o'clock in the afternoon. Between 8 and 8:30 o'clock that night at a point on the highway just below Morrows, La., about forty-three miles from Alexandria, while his car was parked on the right-hand side of the road, the assured was struck and instantly killed by the north bound bus No. 57 of the Interurban Transportation Company.

Plaintiff's theory is that the assured was compelled to stop because of some trouble with his car and that while remedying the trouble, he was struck and fatally injured by the bus which was on the wrong side of the road. On the other hand, defendant admits the parking of assured's automobile, but avers that after parking his car, the assured stood behind it in the dark, in such a way that he was hidden from the view of the bus driver, until the bus was practically opposite his car, when he dashed across the road into the path of the bus for the purpose of committing suicide.

The defense of suicide rests upon the testimony of the bus driver and three passengers, one of whom was a negro, and some remarks the assured is said to have made to Mr. John M. Dameron, whom he met while passing through Alexandria.

The driver and the three passengers testified that when the bus was almost opposite the parked car the assured came from behind the car and ran rapidly across the road into the path of the bus.

The substance of Mr. Dameron's testimony on direct examination is that the assured told him he had been in Arkansas on a visit to some relatives and while there had been

quite sick. That because of the depression his financial condition was bad; that he was too old to work hard; and that he would be worth more dead than alive anyway. That he seemed to be nervous, and when the witness asked him about his troubles he tapped his forehead and stated: "I am kind of off up there at times."

On cross-examination Mr. Dameron stated he observed assured's nervousness when his hand shook as he drank his coffee. The witness, however, admitted that sometimes his own hands shook in the same way. Mr. Dameron testified the assured stated he was feeling better that day and that he was going down to Baton Rouge to see about some work. He also testified the assured would have had no trouble in getting help "if he needed it bad enough."

The highway on which the accident occurred consists of a paved road eighteen feet wide with shoulders of a less substantial material on each side. A black line running down its center divides the paved portion of the road into two nine-foot lanes. At the point where the assured was killed the road is straight, but just south of that point it contains a long curve. The bus which struck the assured is approximately eight feet wide, and the automobile the assured was driving is approximately six feet wide.

Willie Brown, a negro thirty years old, who lived nearby was an eyewitness to the accident. Testifying for plaintiff, he stated, substantially, that he came out of his house to wait for his mother who was on a visit to a neighbor; that he saw the assured working at the rear end of his automobile, which was

parked on the right side of the road with its two right wheels resting about a foot on the shoulder; that the lights on the automobile were burning and its doors were closed; that he did not know whether the man working on his car was white or black; that he started towards him to give him some help; that he could hear the bus coming around the curve and by its lights could see the assured working on his automobile; that the bus was traveling at a rapid rate of speed, with its left wheels about one or two feet over the wrong side of the black line; that the assured "seemed like he didn't see the bus; when he saw it he aimed to get up but the wheel hit him on the left side"; that the bus carried the assured about one hundred feet and threw him off near the left edge of the paved road going north, and then traveled an additional fifty feet before the driver was able to bring it to a stop. The witness testified that he was about seventy-five or eighty feet away from the spot, walking towards the assured's automobile, when the accident occurred. The witness also stated positively that the assured did not run in front of the bus.

We are not favorably impressed by the testimony of defendant's witnesses. The two white passengers, a man and a woman, were apparently willing witnesses for defendant, while they refused to make any statements to the representatives of the assured's family when asked to do so shortly after the accident occurred and before any litigation was contemplated. In fact the woman passenger told plaintiff's representative that she was asleep on the night of the accident; nevertheless she declared on the trial of the case that she saw the accident and testified in great detail in regard thereto. The negro passenger was on his way home from the state penitentiary from which he had been released that day.

While we do not think the witnesses perjured themselves, we think their testimony must be regarded as resulting from a very high state of excitement into which they were naturally thrown by the occurrence of the accident, which was serious enough to distract and confuse the most self-possessed and cool-headed person. But the vital fact is, that their testimony, when weighed against the testimony produced by the plaintiff must be rejected as incredible.

Willie Brown, plaintiff's witness, the only eyewitness to the accident is a foreman for the Hyde Lumber Company, of Morrows, La. For eight or nine years prior to the time he was employed by the lumber company he worked for the Texas & Pacific Railroad Company. He testified directly and intelligently. In commenting upon his testimony, the judge of the district court, declared: "The negro tells a straight story and seems to have no interest in the case." His testimony that the assured was struck on his left side is corroborated by the physical fact that assured's left leg, left thigh, and right arm were broken, indicating that the bus struck the assured on his left side breaking his left leg and left thigh at the point of impact, and throwing him off on his right side, breaking his right arm. His story is further corroborated by the fact that assured's body was thrown on the left side of the road going north and by two blood marks that were found in the road about one or two feet over the left side of the black center line going north.

And the testimony conclusively shows that the assured was not able to run. That in 1921 he had met with a serious accident which crippled his legs so that he was able to do very little walking, and no running whatever. That his business was that of levee and road contractor, and when engaged on any work, because he walked with difficulty he was accustomed to go about his job on horseback or in a horse-drawn vehicle.

The assured, who was about sixty-nine years of age, was slightly deaf, and while the witness Willie Brown was able to hear the noise made by the moving bus, the assured, in all probability, was not.

Defendant contends that plaintiff was motivated to commit suicide by ill health, financial difficulties, and domestic unhappiness.

As we have hereinabove shown, the legal presumption in a case of this kind is against suicide, and we find nothing in the record to rebut that presumption.

The incomplete statements of the assured to defendant's witness Mr. John M. Dameron are not sufficient to show that the assured was contemplating self-destruction. It is true, the assured had been ill, suffering from an attack of influenza, while paying one of his periodical visits to his niece at Walnut Ridge, Ark. But he had recovered from that illness and Dr. Dameron admitted, on cross-examination, that he stated he was feeling better that day and was going to Baton Rouge to see about some work. It is also probably true the assured had suffered in a financial way from the current depression, but he had some resources and an excellent credit and

was in a position to do whatever he wished to do in a business way. He was entitled to an interest in a corporation which was in the course of being organized. After his death, this corporation was organized and obtained some profitable government contracts.

If the assured had any matrimonial difficulties, they occurred almost twenty years before his death. His daughter had become a famous dancer and was living in New York, where the assured's wife also lived for the purpose of chaperoning their daughter. His son lived in Pittsburgh, Pa., where he was engaged in a successful business. Assured appeared to be proud of his children and much attached to them. At the time he was killed he had in contemplation a visit to his wife and daughter in New York. His son had recently visited New Orleans and had taken advantage of that visit to spend a few days with his father. Assured had an attentive and loving niece, whose husband and children were very much attached to him; and he also appears to have had a number of loyal and devoted friends.

The evidence of the assured's family and of his friends is that he was of a cheerful disposition, not subject to spells of despondency. That he accepted philosophically the ups and downs of a contractor's life. He was in a cheerful mood on the morning of April 5, 1932, when he left his niece's home at Walnut Ridge, promising his grandniece, of whom he was very fond, that he would return for her graduation exercises the following month. He was also in his usual good spirits when he visited his mother-in-law and sister-in-law in Shreveport on the morning of April

6, 1932, the day he was killed. He discussed family affairs with them, told them he had just received a letter from his wife, and informed them of his intention to visit his wife and daughter in New York some time during the summer.

Our conclusion is that the defendant has failed to establish its defense of suicide by a preponderance of the evidence, and that no serious or sufficient motive has been shown for the assured to destroy himself.

For the reasons assigned, the judgment appealed from is affirmed.

O'NIELL, C. J., absent.