Edwin J. Oubre died on March 16, 1942, as a result of his having either jumped or fallen out of a window in an office on the twelfth floor of the Carondelet Building in the City of New Orleans. The Mutual Life Insurance Company of New York, hereinafter called the "insurance company", had issued to the deceased two policies of life insurance of $1,000 each, the policies containing a provision for the payment of double indemnity in the event of accidental death. The insurance company paid to Mrs. Oubre, the beneficiary, the principal sum of each policy or a total of $2,000, but refused to pay the double indemnity, whereupon she brought this suit for $2,000 and the insurance company defended upon the ground that the insured did not die as a result of an accident, but because of his having committed suicide.
There was judgment below in favor of defendant dismissing plaintiff's suit and she has appealed.
It appears from the evidence that Mr. Oubre was the bookkeeper of the Progressive Tobacco and Supply Company and that he was discovered to be short in his accounts. Oubre admitted the shortage and announced that it might run over $3,000. He offered to make restitution by transferring all of his possessions, his bank account, automobile and his equity in his home. The papers were prepared by Mr. Paul Weiss, attorney for the Progressive Tobacco and Supply Company, and Oubre was in his office in the presence of Mr. Glen Salm, an officer of the tobacco company and Mr. Hughes, an auditor. As Mr. Weiss was beckoning to Oubre to sign the papers, someone hollered "My God, he has fallen out of the window". Oubre, it seems, had been seated in the window with his back against the frame and one foot on the ground. The window was twenty-three inches above the floor, the sill of which was "eight or nine inches at the first part and where the sash comes down is five or six inches and then there is a protection of terra cotta on the outside, or a total of sixteen or eighteen inches". There were no bars on the windows, but the sash had been pulled down to a point about level with the top of Oubre's ear.
[1] The jurisprudence in this State is to the effect that where a defense of suicide is made to a suit on an accident insurance policy, the burden of proof rests upon the defendant insurance company "to establish the suicide to the exclusion of every other reasonable hypothesis." Webster v. New York Life Insurance Co., 160 La. 854, 868, 107 So. 599; Andrews v. Provident Life Insurance Co., 179 La. 77, 80, 153 So. 26; Pecoraro v. New York Life Insurance Company, La. App., 141 So. 501.
Counsel for the insurance company questions the propriety of this jurisprudence and cites a number of cases from other jurisdictions which, they say, represent a proper statement of the law and are to the effect that in a suit of this kind the presumption against suicide disappears the moment "some evidence is offered inconsistent with suicide and inconsistent wtih death from accidental means. * * * In other words, if there is doubt as to whether the death was accidental or suicidal, there should be judgment for defendant. This has become the accepted rule".
We have nothing more than an academic interest in the conflicting opinions of other jurisdictions and, without intending any reflection upon the learned judges who have written those opinions, we adhere to our own jurisprudence. Any other course would be obviously improper, even though we were convinced that our Supreme Court was in error. While that Court needs no justification at our hnads, a few considerations occur to us which may have had some influence. To begin with "self-preservation is the first law of nature" — for that matter, the first, the second and the third. There are, of course, many suicides, and some of them for what would appear trivial reasons, but, as a rule, we cling to life with all the tenacity of which we are capable. Individuals, the victims of "swift and most unmerciful disaster" which "followed fast and followed faster" sit among the ruins of their fortune, their ambitions, hopes and their health without any of the things which would seem to make life worth living and yet they cling to it with all the fervor of more fortunate persons.
Oubre had been a defaulter for a number of years. He had been detected by his employer. He may be said to have suffered some emotional strain. He had a wife and two children of whom he was inordinately fond. His wife testified that he was a good husband without any bad habits, kind and devoted. The disgrace which the discovery of the defalcation brought *Page 193 
upon him must have affected the sensibilities of such a man to a marked extent, but he was not facing trial before a jury with its attendant publicity or incarceration in the penitentiary because, according to the testimony of his employer's attorney, he had been assured that no prosecution was in contemplation. He could very easily in a moment of despair at the ruin of his modest establishment and, possible estrangement of his family, have been so distressed as to induce him to commit suicide by jumping out of the window in which he was seated. On the other hand, who can say what amount of disgrace and distress will cause a certain individual to destroy himself. Oubre may have had no intention of doing so and unless the evidence excludes every reasonable hypothesis to the contrary, he must be considered to have fallen from the window.
Counsel insist that even under the supreme test imposed by our Supreme Court "it is impossible for the insured to have fallen from the window" and that in the position in which he was seated "there was no way for Oubre to go out of the window without intentionally ducking his head * * *. The window (seat) as can be seen is low and if he had gotten up to leave the window and had become ill or dizzy, he would have fallen towards the inside of the room". Well, perhaps so, but suppose he had put his head intentionally out of the window to look at some object and had become "ill or dizzy", he would not have fallen in the room, it seems to us. On the other hand, let us assume that he slouched in his seat until the top of his head became lower than the sash against which it had rested, he might have lost his balance and fallen. Certainly these are reasonable assumptions.
Counsel directs our attention to the fact that Oubre had twice been requested, first by Mr. Hughes and then by Mr. Weiss, to take a seat in a chair because, as Mr. Weiss said, the chair was softer. Oubre each time complied, but again went back to the window sill. We attach no especial significance to Oubre's maneuvers in this respect because of his highly nervous state. At least that might have explained it, as well as saying that his actions evinced a determination to commit suicide. Moreover, why should Oubre, assuming that he had made up his mind to kill himself, adopt this method of doing so. It seems to us that he would have selected a less public place than the office of his employer's attorney, in the presence of three witnesses and we can think of less painful and more efficient means to that end.
[2] The long and short of it is that while we believe there is a possibility, yes, a probability that Oubre jumped out of the window, we are also convinced that the evidence does not demonstrate this to be the case beyond a reasonable doubt.
In the early case of Leman v. Manhattan Life Insurance Co., 46 La. Ann. 1189, 1193, 15 So. 388, 389, 24 L.R.A. 589, 49 Am.St. Rep. 348, it was said:
"When, as in this case, circumstantial evidence alone is relied on to establish suicide, it is at least within bounds to say the evidence must be of a character to exclude, with reasonable certainty, any other cause of death. If the evidence falls short of this exaction, the suicide is not proved."
For the reasons assigned the judgment appealed from is annulled, avoided and reversed and it is now ordered that there be judgment herein in favor of the plaintiff, Mrs. Clothilde H. Oubre, and against the defendant, Mutual Life Insurance Company of New York, in the full sum of $2,000 with legal interest from judicial demand and all costs.
Reversed.