[Civil No. 3114.  Filed March 21, 1932.]

[9 Pac. (2d) 188.]

# THE PACIFIC MUTUAL LIFE INSURANCE COMPANY OF CALIFORNIA, a Corporation, Appellant, v. JOSEPHINE S. A. YOUNG, Appellee.

Messrs. Kingan, Darnell & Nave, for Appellant.

Mr. Louis G. Hummel, for Appellee.

ROSS, J.—On April 13, 1928, Mannierre E. Young obtained a life policy for $10,000 and on May 7th another life policy for $5,000 from the defendant, the Pacific Mutual Life Insurance Company of California, in both of which the plaintiff, his wife, Josephine S. A. Young was named beneficiary. He paid the first year's premiums on these policies, that on the former being $498.20 and on the latter $226.60. The insured died October 30, 1928. This suit was brought to collect the amount of the policies. These policies contained a promise to pay plaintiff, on receipt of proof of the death of the insured, the respective sums named, but, if insured should commit suicide within one year of the date of the policies, the liability thereon was limited to the premiums paid. The defendant in its answer tendered to plaintiff the amount of the premiums paid on these policies, and alleged that plaintiff had committed suicide within the first year. The trial was had before a jury and resulted in a verdict for plaintiff. The defendant has appealed from the judgment and an order overruling its motion for new trial, and its assignments of error raise the question of the sufficiency of the evidence to support the judgment; also

challenge a ruling on an instruction and the conduct of plaintiff's counsel in his argument to the jury.

There is no question but that the insured died from a dose of cyanide in solution which he swallowed. The plaintiff contends that it was administered the insured feloniously by some person or persons unknown or that the insured took it by mistake or accident thinking it a harmless powder and to induce sleep and allay nervousness and insomnia with which he had been afflicted for several months before his death. The defendant asserts that the evidence adduced at the trial showed that the insured took the cyanide intentionally and for the purpose of ending his life.

Under the contract contained in these life policies all the plaintiff was required to do to make a *prima facie* case entitling her to the insurance was to make proof of the death of the insured. If the defendant would defeat this *prima facie* case it must plead and prove, by a preponderance of the evidence, that the death of the insured resulted from a cause excepted from its contract liability.

We shall consider the case on its merits. If the evidence as to how the insured came to his death is in conflict, the jury's verdict in favor of the plaintiff is conclusive. By this we mean that, if there is any substantial evidence showing or tending to show that the insured was intentionally poisoned by some other person or persons, or that he by mistake took the cyanide believing it to be an innocent sleeping powder, the verdict found was justified and must not be disturbed. On the contrary, if the evidence, that of the plaintiff and of the defendant taken together, not only negatives accidental death and felonious homicide, but with reasonable certainty shows that the insured committed suicide, we cannot escape the duty of so declaring. That is, if the evidence is of such a nature that reasonable persons would have

to find the insured committed suicide, a verdict negativing suicide would have to be set aside.

In *Equitable Life Assur. Soc.* v. *De Johnson,* 36 Ariz. 428, 286 Pac. 817, where the defense was suicide, we said:

"The law applicable to cases of this nature may be stated as follows: Where the defense of suicide is set up in an action by a beneficiary on an insurance policy, the burden of proving that the deceased committed. suicide is upon the defendant. In the absence of proof of the cause of death, the presumption is against suicide. These principles are supported fully by the adjudicated cases. In addition thereto, it is almost universally held that when circumstantial evidence is relied on, the defendant must establish facts which exclude any reasonable hypothesis of anything except suicide. . . . And in cases where either conclusion could be reached, the question is one for the jury. . . .

"On the other hand, there is a limit beyond which even a jury may not go, and that is the line of reasonable probability. If the evidence be such that there is no reasonable theory which can be deduced from the evidence—even though there may be a possible or conjectural one not based on the testimony—on which the jury may find the death was not the result of suicide, a verdict which negatives suicide cannot be sustained."

Bearing in mind the rules of law thus stated, we turn to the facts of the case to see if they sustain, when tested by these rules, the verdict of the jury. The insured was forty-nine years old, very proud and sensitive, a good talker, refined, intelligent, well read and well educated. Besides his wife his family consisted of two minor children, named as beneficiaries in case the wife should predecease him. At the time he took out the policies he resided at Sonoita, Santa Cruz county, Arizona, and was engaged in placer mining. He was a physician, had served as a prescription clerk in a drug-store in Tucson for six or

seven years, was familiar with cyanide, and could easily obtain it. He was in financial troubles. In May and June he overdrew at his bank, and quite a number of his checks were dishonored. In May and April he took out accident and life policies in the sum of $80,000, $30,000 with the defendant and $50,000 with the Northwestern Mutual Life Insurance Company of Milwaukee. He was at the time nervous and suffering from insomnia, which persisted up to the time of his death, according to the allegations of plaintiff's complaint. His wife and children were living with her father. Some time before the 12th of September he left Tucson, ostensibly for Colorado Springs and New York, it is suggested rather than proved, to start life again in a new field. On September 12th, he wrote a letter from Lordsburg, New Mexico, to his attorney, Mr. Louis G. Hummel, of Tucson, saying he was on his way east and asking that his wife be advised, and stating: "Feeling as well as can be expected, I guess."

Five months after taking out the policies, or about October 26th, the insured showed up in Las Vegas, New Mexico, under the assumed name of "James Breen." He had no money, and one suit of underwear aside from the clothes he had on. He registered at the Albert Hotel as from Las Cruces, New Mexico, but said he was from the east and was looking for a site upon which to build a hotel. He was evidently trying to get to Colorado Springs, where, from his conversations and a telegram he left with the Postal Telegraph Company at Las Vegas to be sent to a man by the name of Gray, he expected to get financial assistance. He employed one James Hogg to take him by automobile as far as Raton, New Mexico, in the direction of Colorado Springs, agreeing to pay him $30. They left Las Vegas on

the morning of October 29th and got as far as Springer. Before leaving the insured gave Hogg a check on a Las Vegas bank for $10 as part payment. At Springer, Hogg, becoming suspicious, telephoned the bank on which the check was drawn and learned the insured had no account there. He brought the insured back to Las Vegas and turned him over to the chief of police to be put in the city jail. The insured begged Hogg not to disgrace him thus and also tried to persuade the chief not to lock him up, stating that he had never been put in jail in his life. He got pretty nervous and acted like he was worried and begged to be allowed to stay at a hotel. Without any charge being preferred against him, and with the assurance that none would be if he paid the check the following morning, he was put in the city jail, about midnight October 29th. He was left in the corridor surrounding the cells, where there were a stove, a sink, and a faucet. In this room at the time there were, as the chief said, "just a few young men (6) staying over night, just lodgers for the night, boys around eighteen or twenty years." Later two Mexican wood haulers were, at their request, it being a very cold night, given lodging in the same room. These two Mexicans asked the jailer to call for them at 4 or 5 o'clock in the morning. The jailer called at 4:45 and discovered that the insured was dead, but warm. The Mexicans told him the insured was sick. He was lying on the floor of the jail on some papers with his coat under his head, mouth open, tongue discolored and protruding. Near his head and within his reach was a collapsible drinking cup containing cyanide in solution. On or near the body was a cigarette package containing cyanide. The insured and all the others who occupied the jail that night were searched "for a knife, razor, gun, or any kind of weapon," and the insured

had in his possession a cigarette package. But what was in the package was not determined at the time, the searching officer stating he "felt the· package and put it back in the pocket." The searcher did not find on the insured any collapsible cup.

The other occupants of the jail were questioned as to the insured's actions during the night and nothing could be learned therefrom. They were all released at 9:30 o'clock that morning on the advice of the district attorney that it was not necessary to hold them.

Cyanide was used by the police to kill stray dogs around the jail, but it was kept under lock.

"Breen," during the four or five days he was in Las Vegas, was pleasant and agreeable in his contacts and visited and talked with people freely.

The undertaker at Las Vegas who looked after the insured's body found on his belt the following: "Dr. M. E. Young, Tucson, Arizona." On the inside of his hat band he found a piece of paper on which was written in lead pencil: "In case of accident, sickness or death notify Mr. Louis G. Hummel, Attorney, 37 West Pennington St. Tucson, Arizona." The paper on which this writing appeared looked like a piece of paper that was found underneath the body at the jail. It had the appearance of not having been under the hat band for any length of time.

There is a wide discrepancy in the testimony of the doctor who was called immediately after the insured's death, the chief of police, the undertaker, a druggist who examined the poison, and the chemist who analyzed it, as to the quantity left in the collapsible cup in solution and the quantity in powder or crystal form in the cigarette package. But they all agree that it was cyanide.

The insured's body and his effects, including his suitcase, clothing, the cyanide and some papers and

magazines, were all turned over to Mr. Louis Hummel, friend of insured, and by him taken to Tucson. Mr. Hummel, in a rip or opening at the top of insured's trousers and in the suitcase, found some fragments or pieces of bromide and also blue pieces of paper thought to have been used as wrapping therefor. There was found in the cup an incrustation of bromide, but no signs of cyanide.

The only support of plaintiff's theories of the way the insured came to his death is the presumption in favor of the love of life, or conversely the one against self-destruction. These presumptions are most valuable to a plaintiff "in the absence of proof of the cause of death." *Equitable Life Assur. Society* v. *De Johnson, supra*. But, "where the facts appear from which the issue of accident or suicide might be determined, then all presumptions, such as the love of living, and against suicide, are out of the case." *Thompson* v. *Business Men's Acc. Assn. of America*, (Mo. App.) 231 S. W. 1049; *New York Life Ins. Co.* v. *King*, 28 Ga. App. 607, 112 S. E. 383.

However, if under the facts the cause of death might be equally ascribed to accident or suicide, the presumption is against suicide.

We think, all the facts being considered, it quite conclusively appears that the insured did not die by accident and was not intentionally killed by someone else, but that he took his life deliberately to end what to him was an intolerable situation. There is no evidence that any of the persons who occupied the jail with the insured had cyanide or that any of such persons could have had any motive to take the insured's life. The evidence does show that he was poisoned by cyanide from a cigarette package and that when he was locked up he had in his possession such a package; that the package and the cup from which he drank the cyanide in solution were in close

reach of his body; that the position of his body, head on his coat and papers underneath him, indicated that he had intentionally taken that position. He was familiar with poisons. He knew, of course, the nature and deadly effect of cyanide when taken internally. If he had wanted a harmless sleeping powder he would not have taken it from the cigarette package. His training as a doctor and prescription clerk makes it most difficult, indeed impossible, to believe he mistook cyanide for bromide. Then, he was a proud and sensitive person. He suddenly found himself locked up with a lot of down-and-outers, reduced to their common level. What though he was registered as "James Breen," and not M. E. Young, he felt disgraced. He had suffered from insomnia for several months and was nervous. It was impossible for him to pay the bogus check he had given to Hogg, and the following morning he must pay it or criminal charges would be filed against him.

While there is nothing in the record disclosing that his domestic relations were unhappy, it is quite certain that they were not pleasing to him. He did not write to his wife after he left Tucson in September. He wrote but once and then to his attorney. He was in financial difficulties, and, unlike De Johnson in *Equitable Life Assur. Society* v. *De Johnson, supra,* of whom we said, "Nor had there been anything in his conduct which would have caused the ordinary person to suspect he contemplated suicide," there are many facts and circumstances indicating that the insured might have contemplated suicide. Perhaps one of the most potent is the large amount of insurance that he took out in the months of April and May.

We feel that the verdict of the jury was not only against the weight of the evidence but was without

evidence to support it, except the presumption against suicide and that such presumption was well overturned by all the facts and circumstances disclosed in the testimony. Such being the situation, while we regret being obliged to do it, we feel compelled to reverse the case.

It is a rule, and we think a fair one, that contracts of insurance of doubtful meaning are to be construed most strongly against the insurer; also, if the insurer asserts that the insured committed suicide, it is but just and fair that it be required to establish such defense by a preponderance of the evidence; but, when the facts clearly and definitely show that the insurer is not liable on its contract, we think it is the duty of the court to exercise its revisory powers to protect it.

The judgment of the lower court is reversed and the cause remanded, with directions that plaintiff's complaint be dismissed.

McALISTER, C. J., and LOCKWOOD, J., concur.