HIGGINS, Justice.
 

 Plaintiff, as beneficiary, brought this action to recover the sum of $10,009, representing the face value of an insurance policy issued on the life of her husband by the defendant on May 1,1931.
 

 The defense was that the deceased committed suicide on June 10, 1931, and that under the express terms of the policy, his death having taken place within one year from the date of the issuance of the policy, the company’s liability was limited to the return of the premiums paid, or $20.
 

 There was judgment in favor of the plaintiff as prayed for, and the defendant has' appealed.
 

 The law is clear to the effect that, where an insurance company relies; upon the defense that the insured committed suicide, the burden rests on it to establish the ’fact that the insured voluntarily and intentionally destroyed himself, “to the exclusion of every other reasonable hypothesis.” Pecoraro v. N.
 
 Y.
 
 Life Ins. Co. (La. App.) 141 So. 501, 502 ; Webster v. New York Life Ins. Co., 160. La. 854, 107 So. 599; Eckendorff v. Mutual Life Ins. Co., 154 La. 183, 97 So. 394; Andrews v. Provident Life & Accident Ins. Co., 179 La. 77, 153 So. 26; Cooley, Briefs on Insurance, vol. 6, p. 5454.
 

 Defendant concedes that the above is the rule of law under the jurisprudence of. this state, and argues that it has successfully borne that burden of proof. Plaintiff contends that defendant failed to establish its defense.
 

 The insured, Thomas Gordon, was employed by the Tulane Hardwood Lumber Company,
 
 *982
 
 at New Orleans,' where he resided with his wife and three minor daughters. His wife died on November 16, 1929, and he placed the children in the care of their maternal grandmother, at Brooklyn, N. Y.
 

 On February 23, 1931, he married the plaintiff at New Orleans, and' shortly thereafter they both went to Boston, Mass.
 

 On April 2, 1931, he secured employment with the Atlantic Lumber Company, of Boston, Mass., at a salary of $300 per month, and contributed $150 a month thereof for the maintenance and support of his children.
 

 Under his contract of employment, it was necessáry for the deceased to go to London for the purpose of' establishing an office for his employer and promoting its business. Plaintiff and her husband sailed on the S.- S. American Banker, on April 2, 1931, and arrived at London, England, April 13,1931. The couple lived with Mr. Gordon’s cousin, Miss Dolly. Campbell, for two weeks. On April 27, 1931, Mr. and Mrs..Gordon rented a place and established a joint home and business office. Mr. Gordon experienced great difficulty and trouble in securing orders for lumber, and complained vehemently because his employer had improperly filled previous orders by delivering inferior merchandise, causing serious complaints and disputes.
 

 On May 8,1931, Mr. Gordon became nervous and ill, and his physical condition was such that he required medical attention. Dr. Edwards, who attended him, diagnosed the case as neurasthenia and directed him to go to the St. James Hospital, where he was treated under the supervision of Dr. MacCormac. Three days later he was discharged and made a business trip to Liverpool, Bristol, and Manchester that required four days for the journey. Upon his return, he was so wrought up, agitated, worried, and nervous, because of unsatisfactory business results that he spoke of destroying himself. He tried to commit suicide at his residence by turning on the gas, but was thwarted in his. attempt, due to the foresight of his wife, who had turned off the gas. He frequently spoke of suicide, and continued to suffer from neurasthenia and melancholia.
 

 On May 19, 1931, Dr. Boland Anderson placed Mr. Gordon in an institution for the purpose of receiving treatment and rest. He remained there until June 3, 1931. • His case was diagnosed by the doctor as melancholia. To add to his difficulties and worries, Mr. Gordon received a cablegram from his employers canceling his' contract and ordering him to return to Boston. -
 

 Miss Dolly Campbell, Mr. Gordon’s cousin, testified that, while packing his luggage, preparing to sail for (Boston, the deceased was so weak and overwhelmed by his troubles that he fell to the floor, and, after being assisted to a sitting position, he broke down and wept. He appeared to be exhausted and extremely nervous.
 

 On June 5,.1931, Mr. and Mrs. Gordon sailed for Boston, leaving on the same vessel that brought them over. Mr. Gordon suffered from insomnia and nervousness to such an extent that he was placed in charge of Dr. Belenky, the ship’s physician, who diagnosed his case as melancholia. Dr. Belenky administered sedatives for the purpose of making him sleep, and informed his wife that he was a very sick man and would require her constant attention and care. The doctor ordered rest
 
 *984
 
 and diversion, in order to divert his mind from his worries and troubles. The medicine appeared to give him some rest and peace, and at times he was seen sitting or walking on deck with his wife. He spoke to Dr. Belenky, the captain, the chief officer, and the purser on the steamer of his desire, inclination, and disposition to destroy himself, in order to be relieved of the dilemma in which he was involved.
 

 On June 10, 1931, his wife went to the dining room at 7 p. m., leaving her husband, who did not care to go to dinner-, in the cabin, lying on the bed reading a book entitled “Good Earth.” An hour later she returned and found him asleep with the book lying on his chest. (A half hour later the room steward also saw him lying on the bed.) Plaintiff, having seen her husband sleeping, went to visit in the room of another lady passenger. Returning about 10:30 p. m., she discovered that her husband was not in their room. She walked around the promenade deck, and, being unable to locate him, asked one of the stewards to assist her. His search being unavailing, she then called upon the captain, who, together with members of the crew, made a thorough search of the entire ship, but were unable to find the deceased.
 

 Plaintiff then produced a letter which was undated and unsigned, but which was admitted to have been in the deceased’s handwriting. It reads as follows:
 

 “To The Department of Justice, The Department of Commerce U. S. A. Government.
 

 “This is a statement of facts leading up to my demise. Until June 1930, I, manager of the Tulane Hardwood Lumber Company of New Orleans, had a good position and was happy with my three children, Agnes 13, Jessie 11, Barbara 8.
 

 “My first wife having died of Cancer on November 16, 1930.
 

 “About April 1930 I was attracted by an advertisement in a Hardwood Trade Journal inserted by the Atlantic Lumber Company of Boston, Massachusétts, for an Export Salesmanager. I got the position and believing it to be an excellent opportunity for the future I accepted it at less salary than I had been getting.
 

 “I sent the children to their grandmother at 249 — 65th St. Brooklyn, and have paid her $150.00 monthly ever since for their keep and care.
 

 “I spent nearly a month at the Atlantic Lumber Company’s mills in Louisiana, Arkansas, Tennessee and Georgia, then two months in the Boston Office before I went to Europe on a short business trip. The understanding was that I would spend part of my time abroad.
 

 “I sailed for London on October 2nd and sailed Back for Boston January 1st, having been fairly successful. After my return, business was slow and after a week in Boston I started for the mills again with a view to correcting them with their shipments to avoid claims regarding grade and quality. My suggestions were evidently taken while I was present, but afterwards, disregarded because claims continued to come in.
 

 “Meanwhile I had been keeping correspondence with Miss Mildred in New Orleans who had been my stenographer in the Tulane. Hardwood Company.
 

 
 *986
 
 “On my arrival in New Orleans, after completing my visit to the mills, we were married at St. Paul’s Evangelis Church on February 23rd, and was very happy indeed. Believing myself secure in my position and assured of a good income and a comfortable lióme with my wife and children.
 

 “But upon my return to Boston, early in March, the Atlantic Lumber Company decided that I should return to London, take up residence there and have an office in the home.
 

 “All this sounded feasible and I believed it could be done, but after two weeks things became very slow and the worries of claims, low prices,
 
 expensive
 
 adjustments and the excessive high cost of living over what we had estimated, I developed an acute case of Neurasthenia, was treated by Dr. Edwards, No. 1 Poynders Boad, Clapham, S. W. No. 4.
 

 “Believing myself to be somewhat better, I made a trip to Liverpool, Manchester, and Bristol, to adjust more claims, all of which were justified and required heavy allowances.
 

 “On my return to London, my condition was considerably agitated and I was admitted to St. James Hospital at Balam, S. W., for observation.
 

 “While there I was able to control my mental condition, but was considerably agitated by seeing the incurable ones which of course did me harm. I was discharged after three days, presumably well, and spent the following day going through correspondence. The following morning, however, I awoke at daylight completely overcome with horrible fears and beyond all mental control. Dr. Harold Anderson of Brixton Hill Road was summoned and immediately ordered treatment and rest from business, in a Nursing Home. I was there ten days and the only sleep I got, drugged, and as soon as I would wake, my brain would begin again on my troubles, the fears of being incurable, and the consequent dread of destitution and deprivation for my wife and family. Dr. Anderson advised return to America and having matters discussed with my company as a solution and a possible rest. But the following morning, I received a cable from the company demanding my surrender of contract of agreement in return for homeward passage money. This of course drove me insane, but I cabled immediately and used what money I had to book passage for myself and wife.
 

 “Leaving the home, lease paid only one month in advance, while six is really the duration.
 

 “You can possibly realize my mental condition — I was distracted and thwarted from suicide on two occasions. Something must be done to save the self destruction of others in similar' difficulties and avoid the possible 'destitution and suffering resulting to their dependents.
 

 “I am sure that had my company acted upon my suggestion and continued to ship according to contract, that their reputation would have been assured, business much more, and claims less.
 

 “No doubt they may realize it now since I and my family are the victims.
 

 “No man can do the impossible and it is absolutely impossible for an American unknown to do what hundreds of Englishmen who are familiar with their people and territory are struggling to do.
 

 
 *988
 
 “Their difficulties are in not knowing what the American Mill can do; mine was in getting the mill to do it and the impossibility of reaching the right parties to do business with.
 

 “(I am still extremely agitated, cannot bear people looking at me, and am contemplating self destruction from every angle.)
 

 “(But I think that companies who treat employees as the Atlantic Lumber Company have treated, deserve to be punished and made to provide well for the children whom they deprive a livelihood from.)
 

 “(God forgive me — my troubles may not be over but tlie incident might help others who may be in the same fix.)”
 

 Plaintiff testified that the deceased began to write the letter on June' 6th and finished it on June 8th, and explained that her husband had given her the letter, with instructions to destroy it, because he felt better and had changed his. mind about destroying himself.. However, she kept the letter, and did not destroy it until several days after she returned to New Orleans. In the meantime, the captain of the steamer had made a copy of the letter, which was incorporated in the ship’s log and witnessed by two members of the crew.
 

 Both sides concede that the insured is dead as the result of drowning at sea; plaintiff maintaining that he might have accidently fallen overboard ¿nd the defendant claiming that he deliberately east himself into the sea.
 

 At the time in question, the sea was calm and the weather fair. The promenade and main decks were guarded by railings that extended four feet from the deck, which afforded adequate protection against a person falling overboard. On the promenade deck, in addition to the railings, there was heavy canvass permanently attached to the. rails that served the dual purpose of preventing persons from falling overboard and keeping the sea out in rough weather. The room which plaintiff and her husband occupied was located on the promenade deck, but the door to the room opened inside the main cabin of the ship and not on the deck. The upper or boat deck was not guarded by railing, and it appears that passengers had the liberty of all three decks.
 

 In the case of Webster v. New York Life Ins. Co., 160 La. 854, 107 So. 599, 607, the court said:
 

 “The general purport of those decisions is that, while .all other circumstances are to be considered, nevertheless.motive is
 
 not alone one of
 
 many minor
 
 circumstances
 
 to be considered along with others, but
 
 is of itself the one major circumstance and prime consideran tion on
 
 which the whole case-generally hinges. * ' * *
 

 “We have shown, wé think, that, inquiring into the alleged suicide of a person deemed sane, where there is no direct evidence, ás of eye witnesses, suicide notes, or previous declarations, the physical surroundings, which almost always leave room for doubt as to accident or suicide, must be
 
 subordinated to the evidence as to motive.
 
 The reason is that, although the physical evidence may show unmistakably that the deceased killed himself, nevertheless it does not usually show with the same certainty whether he did so intentionally or unintentionally, and hence that fact must be ascertained by inquiring whether the deceased had or had not
 
 some strong mo
 
 
 *990
 

 tive
 
 fór taking his own life. In other -words, the physical facts tend principally to show whether or not the deceased died by his own hand; whilst the evidence as to motive bears principally on the intent of the deceased at the time he killed himself.
 
 If the deceased had no strong motive for taking his own life, the presumption would he that he did so accidentally;
 
 on the other hand, if he
 
 did have some■ strong motive
 
 for doing so,
 
 the inference naturally is that he did so intentionally.”
 
 (Italics ours.)
 

 In- the instant case there was serious and strong motive for the deceased taking his life. His health was seriously impaired. He was discouraged and despaired. He had suffered a nervous breakdown. He had serious disagreement with his employer. He was threatened with loss of employment. He was burdened with financial worries. He was agitated and upset from being separated from his children, and'brooded over the death'of his first wife. He unbosomed himself to the several doctors who had waited upon him and to the captain, the chief officer, and purser of the steamer, and his wife, telling them of his overwhelming desire to destroy himself. He had previously actually attempted suicide.
 

 The room in which he was last seen was left ih its normal condition, showing no evidence of violence. There ‘ was nothing about the railing of the ship to show that any one had heavily fallen against these protections, and the evidence is overwhelming that no one on the promenade or main deck could have fallen into the sea unless they deliberately and intentionally wanted to do so.
 

 While the law places upon the insurance company the .burden of proving that the deceased committed suicide “to the exclusion of every other
 
 reasonable
 
 hypothesis” of death by any other means, it is not required to offer-proof sufficient to eliminate every speculative, fantastic, conjectural, frivolous, and imaginary hypothesis of death in any other way.
 

 It is our opinion that the evidence in this case shows clearly and beyond any rational doubt that the deceased intentionally destroyed himself.
 

 Por the reasons assigned, the judgment appealed from is annulled, avoided, and reversed, and it is now ordered, adjudged, and decreed that there be judgment herein in favor of the defendant, the Acacia Mutual Life Association of Washington, D. C., and against the -plaintiff, Mrs. Mildred Newdigate, widow of Thomas Gordon, dismissing her suit at her costs.
 

 BRUNOT,
 
 if.,
 
 dissents.