[Civil No. 4559.  Filed June 14, 1943.]

[138 Pac. (2d) 414.]

NEW YORK LIFE INSURANCE COMPANY, a Corporation, Appellant, v. WILLA FRANCES HUNTER, Appellee.

Messrs. Ellinwood & Ross and Mr. Joseph S. Jenckes, Jr., for Appellant.

Messrs. Wilson & Wilson, for Appellee.

ROSS, J.—This is an appeal by the New York Life Insurance Company from a judgment against it in an action to collect an insurance policy. The policy was on the life of Charles B. H. Hunter and in it the plaintiff Willa Frances Hunter, mother of the insured, is named as the beneficiary. The policy was for $2,000 and was issued November 12, 1940. The insured died on or about September 4, 1941, some 10 months after the policy was issued. The plaintiff seeks to recover the amount of the policy. The defendant, in response to the complaint, tendered the amount of the premium it had received, to wit, $38.88 and set up as a defense to the action a stipulation of the policy in the following words:

"*Self-destruction.*—In event of self-destruction during the first two insurance years, whether the Insured be sane or insane, the insurance under this Policy shall be a sum equal to the premiums hereon which have been paid to and received by the Company and no more."

The case was tried before a jury, the only contested question being whether the insured committed suicide, or died from natural or accidental causes, or was killed. The jury resolved the answer in favor of the plaintiff and returned a verdict for $2,000, the full face value of the policy, upon which judgment was entered. Defendant has appealed.

At the close of the case the defendant moved for an instructed verdict, contending the evidence was conclusive the insured destroyed himself. The denial of this motion is assigned as error. Whether the court's ruling was right or not depends upon what the evidence in the case shows, and that we now consider.

The insured, a young man 23 years old, lived with his mother and a younger sister, near Phoenix, and was operating, and had been for some time operating, a service station and garage near Glendale, Arizona. If he was not losing money during the summer of 1941, it seems certain he was not making money.

He and a 15-year-old boy by the name of Robert Lowell Howard were on the day shift, from seven in the morning to seven at night. William D. Flynn was in charge during the nights. According to Flynn, around ten o'clock Wednesday night, September 3, 1941, the insured came to the garage and changed his clothes and got $2.00 in money. The next morning, about six o'clock, he returned and to Flynn's inquiry "How are you coming? Did you go home?" he answered "Wait." He then gave some water to a dog that had been left with him by some one and went back to the garage, changed his clothes and left through a side door without answering Flynn's questions, and that was the last time Flynn saw him. Flynn noticed he had emptied the contents of his pocket onto his bed and saw some little change. This bed had on it an army blanket at the time, which was later found lying on the insured's dead body on the desert.

Howard testified that the insured was indulging in the use of intoxicating liquors around the garage during the day shifts. Other witnesses also stated that he was drinking liquor around the garage. Opal Baker, a waitress at the Top Hat Cafe located near the Hunter service station, testified she had gone out with him two

or three times and that on one occasion, in July, 1941, he had said:

" . . . he had been everywhere he wanted to go and seen everything he wanted to see and he was ready to die and he thought some time he would just end it all . . . ."

They had been drinking and between them consumed a pint of liquor.

He made a similar statement to Robert Lowell Howard, who had warned him against his reckless driving, saying "he didn't care, he had seen all he wanted to see and didn't care when he died, or something to that effect."

Mrs. Margaret Snyder, of Phoenix, testified to meeting the insured the night of September 3, 1941 in the Triangle Bar in Glendale and to having some drinks of liquor with him and others, and that while they were laughing and talking at the bar he said: "I am going to kill myself" and upon being rebuked by her he laughed just as though to say "Well, forget it."

It is in evidence that he was, or had been, intensely in love with a girl school-mate living in El Paso, Texas, and that she at one time fully reciprocated his love. They became engaged to marry but about this time, as the course of true love never runs smooth, she began gradually to break away from him. On July 28, 1941, the insured wrote her, addressing her as "Mig Darling" (not necessary to give her name) and, among other things, said:

"Last night I went to bed at seven o'clock and slept until six-thirty this morning. I was completely washed out after an all night session the nite before. We drank enough whiskey to float a ship but never did get really tite.

"Drink offers me an escape from the reality, so I drink. I don't especially like the stuff but I can get away from it all.

. . . . . . . . . . . . . .

"I'm completely worn out by nine months of work with hardly a day off. Anything is better than twelve to fifteen hours work a day, seven days a week. Then too, I am sleeping here nights so I'm never completely away from work. . . . "

In this letter he also proposed marriage at once.

August 10, 1941, he wrote Mig and, among other things, said:

"I was married last night. . . .

. . . . . . . . . . . . . .

"So honey this is the end—this is the parting of way—this is good by— God bless you and keep you."

This was not mailed but was found among his effects after his death.

August 14, 1941, by air-mail, he wrote Mig as follows:

"I'm terribly sorry if my asking you to marry me has caused you to stop writing. . . .

. . . . . . . . . . . . . .

"One day soon I'm going off on the little trip I've planned so long. I'm about due for a rest and I think this time I'll get it. There's several people I want to see and this is as good a time as any. . . . "

August 17, 1941 Mig wrote the insured a letter, of a noncommittal nature, clearly intended to impress him that she still loved him, but stated she thought it inadvisable for them to marry now.

August 19, 1941 the insured wrote Mig and, among other things, said:

"In one letter you say you're ready, able and willing to marry me anytime, any place. But when I set a date you turn right around and write a big NO.

"The crust of the whole thing is this: I don't know about you, but as for myself, I can't go on like this.

I've been working twelve to fifteen hours a day a worrying myself to death the remainder of the twenty-four—and then to have to worry about the affairs of my heart—well—I've just reached the end of my rope. I absolutely don't care what happens any more. I've loved you until it hurt dreadfully—I've been true to you and I have tried my feeble best to work out a solution to our problems.''

Saturday, August 30, 1941, at eleven or twelve o'clock at night, the insured telephoned Mig over long distance. When she was asked the substance of their conversation, she said: ''He kept telling me he was going to come to El Paso to see me and probably within the week. . . . That was the main thing.'' When asked if they discussed the contents of their correspondence she answered ''I don't remember.''

The last time the insured was seen alive, according to the record, was Thursday, September 4th at about six o'clock in the morning. Flynn, the night man at the service station, gives this as the time and place he last saw him. This is corroborated by Harvey Merle Burgett, night cook at the Top Hat Cafe, who testified he saw insured as he pulled off the washrack, where he had parked his car, a little after six o'clock in the morning of the day preceding the finding of his dead body. This witness says he saw him leave and waved to him and he waved back, and that the insured was driving a four-door Chevrolet sedan at the time.

The morning of September 4th, between six and seven o'clock, John L. Cordova, who had charge of a force of men plowing and leveling a section of new land north of the Arizona Canal and near Lateral 16, three or four miles from Glendale, first saw, parked in a bunch of brush near a road which he described as a ''short cut,'' a Chevrolet sedan, which remained there all that day and was there the following morning. Cordova and Tommy Moseley on their way

home after the day's work on September 5th, along about six o'clock were passing the place where the Chevrolet was parked and stopped and looked it over. Through the closed windows they saw the insured's dead body, inspected the ground in the immediate neighborhood and saw no footprints leading to or leaving the sedan. They did find the tracks of the sedan from the short cut road to where it was parked. The sheriff's office in Phoenix and the constable and justice of the peace, who is *ex officio* coroner, of Glendale, were notified. Sheriff Lon Jordan set four of his deputies to the job of investigating the matter and the constable and coroner of Glendale appeared on the scene and, after looking the ground over and learning what they could, they all concluded to let the matter drop.

The conditions around and in the parked automobile were thoroughly investigated and the facts disclosed were these: All the windows and doors were tightly closed, with the key inside. There was fitted into the exhaust pipe an old worn piece of garden hose, the other end of which was in three or four coils on the ground near the left side or left hind wheel. The ignition switch was off and there was gasoline in the tank. The insured's body was in the back seat partially covered with an army blanket from his service station. His right arm was hanging down toward the floor of the car. There lay on the floor, between the front and back seats, an unloaded twenty-two target pistol. There were no shells for it, either empty or loaded. There was found in the car a drinking glass and what the witnesses described as a vinegar cruet. There were towels and pieces or strips of cloth such as might be used to clean the car. There was no evidence of any violence or of a struggle in or about the car and no evidence of external injury to the body or to the head.

No autopsy was held. The attending physician said the body was decomposed and maggot-infested when found. He examined it for wounds, as best he could, and found none.

If this evidence fails to show the cause of the insured's death, the verdict and judgment should not be disturbed.

In *Equitable Life Assurance Society* v. *De Johnson*, 36 Ariz. 428, 286 Pac. 817, 818, a case of the same general nature, we stated the rule as follows:

" . . . Where the defense of suicide is set up in an action by a beneficiary on an insurance policy, the burden of proving that the deceased committed suicide is upon the defendant. In the absence of proof of the cause of death, the presumption is against suicide. These principles are supported fully by the adjudicated cases. In addition thereto, it is almost universally held that when circumstantial evidence is relied on, the defendant must establish facts which exclude any reasonable hypothesis of anything except suicide. . . . and in cases where either conclusion could be reached, the question is one for the jury. . . .

"On the other hand, there is a limit beyond which even a jury may not go, and that is the line of reasonable probability. If the evidence be such that there is no reasonable theory which can be deduced from the evidence—even though there may be a possible or conjectural one not based on the testimony—on which the jury may find the death was not the result of suicide, a verdict which negatives suicide cannot be sustained. . . . "

Did the insured die from natural causes? There is no evidence submitted showing or tending to show that he was physically ill. On the contrary, it is all to the effect that he was and had been all his life a normally active, healthy and well person. He was not suffering from any bodily ailments or diseases.

Did he die from accident? There is nothing in the evidence showing or tending to show that he did.

Was his death the result of a homicide? If so, it seems some evidence to that effect would have been found.

There is no evidence that he died from accidental or natural causes or that he was murdered.

■ The plaintiff does not state what in her opinion caused his death. She argues that the garden hose attached to the exhaust pipe could not have been the means used to cause his death because the loose end thereof was not in the automobile but was coiled on the ground beside it. And another reason, after the insured ·had entered the automobile and closed all the openings into it, the gasoline was never ignited or the. engine operated. No one contends insured shot himself. Plaintiff relies solely, as she must, upon ''the presumption against suicide'' and the love of life and desire one has to live. That presumption is good in the absence of proof of suicide. If the evidence preponderates in favor of suicide, the presumption is wiped out. In *Newdigate* v. *Acacia Mutual Life Association of Washington, D. C.,* 180 La. 979, 158 So. 358, 362, the rule and its qualifications are contained in this statement:

''While the law places upon the insurance company the burden of proving that the deceased committed suicide 'to the exclusion of every other *reasonable* hypothesis' of death by any other means, it is not required to offer proof sufficient to eliminate every speculative, fantastic, conjectural, frivolous, and imaginary hypothesis of death in any other way.''

■ If any one will read the insured's letters to Mig heretofore set out in this opinion, examine his statements to witnesses made during July, August and September, and analyze his conduct and actions the last few days of his life, he can reach no other conclusion than that the insured took his own life. He said repeatedly he was going to do it, and there is not a circumstance surrounding his death indicating he met

with foul play, or that his heart ceased to beat from natural causes,. or from injury suffered through accident. Then what caused his death? It is not incumbent upon the defendant to show the means used in taking his life. The only burden on defendant was to show by a preponderance of the evidence that insured died at his own hands. That the defendant did this is too clear for argument.

██ *Pacific Mutual Life Insurance Company* v. *Young,* 40 Ariz. 1, 9 Pac. (2d) 188, 191, was a case involving the question as to whether the insured committed suicide, or died from natural causes, or was murdered, and, after reviewing the law and the evidence, we came to the conclusion, which we adopt here, as follows:

"We feel that the verdict of the jury was not only against the weight of the evidence but was without evidence to support it, except the presumption against suicide and that such presumption was well overturned by all the facts and circumstances disclosed in the testimony. Such being the situation, while we regret being obliged to do it, we feel compelled to reverse the case.

"It is a rule, and we think a fair one, that contracts of insurance of doubtful meaning are to be construed most strongly against the insurer; also, if the insurer asserts that the insured committed suicide, it is but just and fair that it be required to establish such defense by a preponderance of the evidence; but, when the facts clearly and definitely show that the insurer is not liable on its contract, we think it is the duty of the court to exercise its revisory powers to protect it."

The judgment of the lower court is reversed and the cause remanded, with directions that plaintiff's complaint be dismissed.

McALISTER, C. J., and STANFORD, J., concur.