PIONEER INTERNATIONAL HOTEL,
Plaintiff-Appellant,

v.

FIRST COLONY LIFE INSURANCE
CO., Defendant-Appellee.

The UNION BANK,
Plaintiff-Appellant,

v.

The PRUDENTIAL INSURANCE
COMPANY OF AMERICA,
Defendant-Appellee.

Charles H. WHITEHILL,
Plaintiff-Appellant,

v.

The NEW YORK LIFE INSURANCE
CO., Defendant-Appellee.

No. 74–1454.

United States Court of Appeals,
Ninth Circuit.

Dec. 9, 1975.

Paul G. Rees, Jr. (argued), Tucson, Ariz., for plaintiffs-appellants.

Richard M. Bilby (argued), Bilby, Thompson, Shoenhair & Warnock, Tucson, Ariz., Jerome B. Shultz (argued), Fennemore, Craig, VonAmmon & Udall, Phoenix, Ariz., A. O. Johnson (argued), Tucson, Ariz., for defendants-appellees.

OPINION

Before BARNES and ELY, Circuit Judges, and PALMIERI,* District Judge.

BARNES, Senior Circuit Judge:

Three separate actions were filed in the United States District Court for the District of Arizona, Tucson Division, seeking to recover death benefits under three separate policies of life insurance. The insured under each of the policies was one Newton S. Pfeffer. All three were subsequently consolidated for trial.

After the close of the defendants' case, the Court entered a finding that there was no issue for the jury to determine and that under the law the defendants were entitled to directed verdicts. Subsequently, judgment was entered in favor of each of the defendants against the plaintiffs.

---

* The Honorable Edmund L. Palmieri, Senior District Judge, Southern District of New York, sitting by designation.

Each of the plaintiffs filed a joint motion for a new trial. The motion was denied in each of the cases. Thereafter Appellants' Notice of Appeal was filed.

## 1.

### A. FACTS

The decedent-insured Newton S. Pfeffer died on Saturday, March 29, 1969, as a result of a fall from the Pioneer International Hotel Building in Tucson, Arizona. Mr. Pfeffer had been a jeweler in Tucson for many years and in 1966 opened his own store. His business had been progressing and in late 1968 was in good financial condition.

During this time Mr. Pfeffer was in debt in the amount of $180,000 to Mr. Whitehill, his attorney (and one of the plaintiffs herein) and other personal friends, $150,000 to the Southern Arizona Bank, $75–80,000 to The Union Bank, and had entered into a long term lease with the Pioneer Hotel. As security for these transactions, the creditors, the plaintiffs-appellants in this case, procured the following life insurance policies:

1. Pioneer International Hotel was issued a whole life policy on March 18, 1969, by First Colony Life Insurance Company with a face amount of $150,000.

2. The Union Bank was issued a policy on February 5, 1968, by The Prudential Insurance Company in the face amount of $25,000 with a decreasing term rider of an initial amount of $100,000. (As of the date of death, the term insurance benefits were $92,600.)

3. Pfeffer was issued a policy on March 6, 1969, by New York Life Insurance Company in the amount of $125,000, and on March 25, 1969, changed the beneficiary to Mr. Charles Whitehill.

Each of the insurance policies in question had a suicide exclusion clause, the exact language of which is here immaterial. It was undisputed that Mr. Pfeffer's death occurred during the contestability period.

During the fall of 1968, Mr. Pfeffer commenced doing business with a man initially known to him as Mr. Bennett, who later turned out to be one John Battaglia. These dealings, which commenced on a cash basis, subsequently turned into credit transactions and despite warnings from his manager and his employees in late 1968 and early 1969, Mr. Pfeffer continued to do business with Mr. Battaglia. From February 19, 1969, through March 20, 1969, Mr. Smith, a Pfeffer employee, took nine trips from Tucson to Los Angeles to deliver large amounts of valuable jewelry to Mr. Battaglia. (TR 322) As of the date of Mr. Pfeffer's death, he had delivered to Mr. Battaglia approximately one and one-half million dollars in jewelry at wholesale value which had not been paid for or returned.

After Smith's fourth trip on March 3, 1969, Pfeffer, when confronted by his wife and Mr. Whitehill, promised that he would have no more dealings with Battaglia. Subsequently, he sent Smith on five more trips from March 12 through March 20 in which large amounts of valuable jewelry were delivered to Mr. Battaglia. As a result of the delivery of the jewelry, and the refusal of Battaglia to return or pay for it, Pfeffer was in very deep, serious financial difficulty. Mr. Whitehill admitted in testimony that unless the jewelry was returned or paid for, Mr. Pfeffer was definitely insolvent.

The last week of Mr. Pfeffer's life started with a meeting with Charles Whitehill on Monday morning, March 24. Mr. Pfeffer confessed to Mr. Whitehill that contrary to his promises of March 3, to Mr. Whitehill and Mrs. Pfeffer, he had continued delivering jewelry without a receipt to Mr. Battaglia. Mr. Whitehill and Mr. Pfeffer then met with Mr. Robert Tullar, another attorney in Tucson, Arizona, to discuss this matter. The next day, March 25, a second meeting was held with Tullar and he (Tullar) recommended that Pfeffer go to the authorities, but Pfeffer resisted. (TR 212) The following day, March 26, Mr. Pfeffer went to Los Angeles to meet with Battaglia in an effort to obtain the return of the jewelry. The trip was unfruitful.

On Thursday, March 27, Mr. Tullar contacted the FBI and a meeting was held later that day with various attorneys, Mr. Pfeffer and representatives of the FBI. It was also on this date that Mr. Whitehill first contacted the jewelry wholesalers in New York to tell them of Mr. Pfeffer's problems.

Unbeknownst to Mr. Whitehill, Mr. Pfeffer had a meeting on Thursday morning, March 27, with his barber, Bill Nocei, and informed him that he was going to commit suicide because of his financial problems arising out of his dealings with Battaglia.

Significantly, he stated his method of suicide was to be a jump from the Tucson Federal Savings Building or the Pioneer Hotel. (TR 314)

While Mr. Pfeffer met numerous times with his attorney Mr. Tullar in an effort allegedly to straighten this matter out, he never told Mr. Tullar about Mr. Smith's nine trips to Los Angeles with the jewelry. Furthermore, Mr. Tullar was sure as late as the morning of Pfeffer's death he had not yet received a full and complete statement from Pfeffer.

March 29, 1969 started with a breakfast meeting attended by Mr. Pfeffer, Mr. Whitehill and two representatives of the New York wholesale jewelers. Following that meeting, Mr. David Hyman, a representative of the wholesale jewelers, returned to New York with a quantity of the jewelry which his firm had placed in Mr. Pfeffer's store. When Mr.

We adopt material portions of the Statement of Facts relied on by appellees.[1]

Pfeffer returned to his office that day he refused the carnation which he traditionally wore in his lapel. At 10:00 a. m. on this day, a meeting was held in Mr. Tullar's office with an insurance adjuster, Mr. Whitehill, Mr. Pfeffer and Mr. Berger, another attorney in Mr. Whitehill's office. Both Messrs. Tullar and Whitehill insisted that Mr. Pfeffer dictate the complete story for the FBI. Subsequent to the meeting, Pfeffer obtained some dictating equipment and put it in his car.

### B.  MR. PFEFFER'S DEATH

It was stipulated between the parties that Pfeffer died on March 29, 1969 and the death resulted from injuries sustained by him following a fall from the Pioneer Hotel Building to the street below. Pfeffer left the south side of the building from the stairwell between the tenth and eleventh floors and before landing on the street, struck a light pole. The local Justice of the Peace, whose obligation it was to sign death certificates, was seated across from the Pioneer Hotel in the Walgreen's Drug Store at the time of Mr. Pfeffer's death. Judge Jacobson saw the body hit the lamppost. (TR 68) Subsequently, he spent two days checking the police report, the photographs, the investigation reports, going to the top floor and checking out the area in which it was stipulated Mr. Pfeffer had exited the building, and reviewing the death certificate. Based on this investigation, he signed the death certificate showing the cause of death as being suicide.

At the time Judge Jacobson signed the death certificate, he was not aware that Mr. Pfeffer had written in longhand a pathetic suicide note to his wife, which read as follows:

"Dear Shirlee. 1. Please use Bring's Funeral Home.

2.  Suggest you cremate.

3.  Make donations to U of A.

4.  I have let all my friends down. I did a stupid, foolish act by trying to deal with a bad character. He had nothing on me. I was going for a big sale to get everyone paid.

5.  Make John Battaglia pay all his life for the way this mad dog created a situation for me from which I couldn't extricate myself.

6.  No man ever, had a more worthy son or better wife or could ever find one.

7.  I can't stand the pressures of letting every one down so I must go this way.

8.  What I have done will make headlines anywhere, but I don't even have enough imagination to do an unmessy job.

9.  Shirlee and Jeff, I just don't know another way to salvage something for my friends so I am going this way.

10.  May God in his infinite wisdom protect you in the days ahead.

11.  I realize what I have done to you but I have involved too many of my friends with my foolhardy sales to John Battaglia. Love, Newt."

The note was discovered after Pfeffer's death in the rear of Mr. Pfeffer's desk. The handwriting was identified by Mr. Whitehill and Mrs. Pfeffer as being that of Mr. Pfeffer.

### C.  STATE OF DECEDENT'S MIND

A great deal of the testimony in this case surrounded the alleged state of mind of the decedent during the week prior to his death. The plaintiffs attempted to show that while Mr. Pfeffer was quite despondent at the first of the week, by Thursday and Friday he was becoming more encouraged that he could solve his financial problems. However, on Saturday, the day of his death, the creditors informed Mr. Whitehill that the loss of jewelry was one and one-half million dollars at wholesale price and Mr. Pfeffer's last minute attempt to borrow or somehow ransom the jewelry back through a mysterious Mr. Kalif failed. Also, on Saturday morning the insurance adjuster stated his opinion to Mr. Pfeffer that there was no coverage with respect to the losses sustained in the Battaglia transactions. The adjuster also stated that Mr. Pfeffer's spirits were low. When he (the adjuster) heard of the death he assumed it was suicide. Mr. Pfeffer who was an egotistical and very proud man, knew that after he dictated his complete statement and it became public knowledge he would be held in complete and utter ridicule in the community.

Subsequent to lunch and immediately prior to his death, Mr. Pfeffer had a conversation with Mr. Sid Morris, one of his employees, in which he said: "Sid, you're terrific. Just keep working and do a good job." He then shook hands limply and stated: "I am going upstairs, I will be down in one minute."

Mrs. Pfeffer believed him to be desperate, particularly during the last week of his life. She also stated that at the luncheon several hours before Mr. Pfeffer's death, nothing was said that would indicate any hope of alleviating Mr. Pfeffer's financial problems.

### D.  MOTION FOR NEW TRIAL

After judgments were entered in favor of defendants, plaintiffs filed a motion for a new trial to which was attached a statement by newly discovered witness Nellie Dunham, who witnessed Pfeffer's fall. By virtue of the statement it was claimed that this constituted newly discovered evidence that was not available to Plaintiffs' attorney at the time of trial.

Mrs. Dunham, who was located across the street and down the block, to the east of the hotel did not see Mr. Pfeffer exit the building, but only saw him falling. Subsequently, she saw a hand come out and close a window on the south side of the Pioneer Hotel. Mrs. Dunham specifically stated in her deposition: "Well, I didn't see him come out of the window."

The trial court denied plaintiffs' motion, holding that nothing had been presented which would justify the granting of a new trial.

Two issues are raised:

1. Was the evidence such that any conclusion, other than suicide, could be reasonably drawn? Our answer is, it was not.

2. Was the denial of plaintiff's motion for new trial proper? Our answer is it was.

■ Our answer as to issue 1. is based on the leading cases of *Equitable Life Assurance Co. v. De Johnson,* 36 Ariz. 428, 286 P. 817 at 818, 819 (1930); *Pacific Mutual v. Young,* 40 Ariz. 1, 9 P.2d 188 (1932); and *New York Life Insurance Co. v. Hunter,* 60 Ariz. 416, 138 P.2d 414 at 416 (1943).

In the *Equitable Life* case, the court said:

" . . . where the evidence is of such a nature that a reasonable man could find only one state of facts to exist, a verdict which necessarily is based on the assumption of an opposite situation will not be allowed to stand. The law applicable to cases of this nature may be stated as follows: Where the defense of suicide is set up in an action by a beneficiary on an insurance policy, the burden of proving that the deceased committed suicide is upon the defendant. In the absence of proof of the cause of death, the presumption is against suicide. These principles are supported fully by the adjudicated cases. In addition thereto, it is almost universally held that when circumstantial evidence is relied on, the defendant must establish facts which exclude any reasonable hypothesis of anything except suicide (cases and other authorities cited), and in cases where either conclusion could be reached, the question is one for the jury. (cases cited)

"On the other hand, there is a limit beyond which even a jury may not go, and that is the line of reasonable probability. If the evidence be such that there is no reasonable theory which can be deduced from the evidence—even though there may be a possible or conjectural one not based on the testimony—on which the jury may find the death was not the result of suicide, a verdict which negatives suicide cannot be sustained. (cases cited)

\*    \*    \*    \*    \*    \*

"In determining whether or not a chain of circumstances necessarily as a matter of law leads to a given conclusion, we think the following to be a reliable test: First, is the assumed conclusion consistent with all of the known circumstances; and second, are any of these circumstances inconsistent with any other conclusion? If the answer to both questions is in the affirmative, then the assumed conclusion is a matter of law for the court, and a verdict should be instructed in conformity therewith. If on the other hand, there is more than one conclusion consistent with all of the known facts, the question is one for the jury, and their decision will not be disturbed by the appellate court."

■ On the insufficiency of Mrs. Dunham's evidence to require a new trial we conclude that she saw "a body falling." This was not new evidence. She also saw a man's hand "extend from a window" and close the window on one of the upper floors of the hotel. She did not see Pfeffer or anyone else leave a window. In denying the plaintiff's motion for a new trial, the district judge remarked to the effect that even if he accepted all of the alleged new evidence of Mrs. Dunham, his conclusion on the issue of liability would not be altered. The district judge obviously deemed the alleged new evidence to be without significant substance, and with that conclusion, we agree. Ordinarily, the test for determining the propriety of denying a motion for new trial based upon newly discovered evidence is whether there has been an abuse of discretion. In this case, there was clearly no such abuse.

We can only conclude that the trial court's conclusion of suicide was consistent with all of the known circumstances.

Affirmed.